JONES DISTRIBUTING COMPANY, INC., an Iowa corporation, Plaintiff,

v.

WHITE CONSOLIDATED INDUSTRIES, INC., a Delaware corporation, and Frigidaire Company, a division thereof, Defendants.

No. C 94–4029–MWB.

United States District Court, N.D. Iowa, Western Division.

Sept. 15, 1996.

1448

**1449**

Steven R. Jensen of Crary, Huff, Inkster, Hecht & Sheehan, P.C., Sioux City, IA, for Plaintiff Jones Distributing Company.

Stephen D. Turner and Ellen S. Carmody of Law, Weathers & Richardson, P.C., Grand Rapids, MI, for Defendant WCI and its Frigidaire division.

**MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION .......................................................1450
II. STANDARDS FOR SUMMARY JUDGMENT ..............................1452
III. FACTUAL BACKGROUND ...........................................1453
 A. Undisputed Facts .............................................1453
 B. Disputed Facts ..............................................1456
IV. LEGAL ANALYSIS ..................................................1457
 A. Violation Of Franchise Laws .................................1457
 B. Choice Of Law On Tort And Contract Claims ...................1458
 C. Contract Claims .............................................1459
 1. Unconscionability ........................................1459
 a. Ohio law of unconscionability ........................1460
 b. Unconscionability here ...............................1462
 2. Breach of contract........................................1464
 3. Breach of covenant of good faith and fair dealing .........1465
 a. The covenant of good faith and fair dealing under Ohio law ..........1465
 b. Jones's allegations of breach of good faith .........1466
 D. Tort Claims .................................................1467
 1. Tortious interference with business relationships .........1467
 a. Tortious interference under Iowa law..................1467
 b. Jones's claim of tortious interference ...............1468
 2. Fraudulent misrepresentation..............................1468
 a. Fraudulent misrepresentation under Iowa law ..........1469
 b. The effect of an integration clause under Iowa law ...1470
 c. Misrepresentations in the cover letter ...............1471
 d. Reliance .............................................1471
 3. Fraudulent non-disclosure ................................1472
 a. Fraudulent non-disclosure under Iowa law .............1473
 b. WCI's duty to disclose...............................1473
 c. When does the duty arise? ............................1474
 i. One stated test................................1474
 ii. Other general tests ...........................1474
 iii. Tests in Restatement (Second) of Torts § 551 ..................1475
 d. Other elements of the claim ..........................1479
 E. WCI's Counterclaim...........................................1479
V. CONCLUSION ......................................................1480

---

The defendant's motions for summary judgment on plaintiff's claims and its own counterclaim in this lawsuit between a distributor and a manufacturer of household appliances have already had two salutary effects. First, they have led to the agreed disposition of some of the plethora of claims originally pleaded by the plaintiff, because the parties now agree there is insufficient factual or legal basis for those particular claims. Thus, the parties and the court may focus their resources on truly contested matters. Second, although the court would ordinarily be required to determine what state's law applies to what claims in a diversity action such as this, the parties appear to be in agreement on this potentially critical issue as well. Nonetheless, the court must still determine whether genuine issues of material fact require submitting to a jury any of the plaintiff's remaining claims arising from the termination of a distributorship contract in

the face of defendant's motion for summary judgment. Those remaining claims include unconscionability of an at-will termination provision and consequent breach of a distributorship contract, breach of an implied covenant of good faith and fair dealing in a distributorship contract, tortious interference with business relationships, fraudulent misrepresentation, fraudulent non-disclosure, and violation of state franchise laws. Defendant has also moved for summary judgment on its counterclaim for sums due under a statement of account in connection with the distributorship agreement. Although plaintiff does not dispute the sum due, it does contend that judgment should not now be entered on defendant's counterclaim, because plaintiff may be entitled to damages against the defendant in excess of the sum defendant is owed.

## I. INTRODUCTION

Plaintiff Jones Distributing Company (Jones) filed its original complaint and jury demand in this action on March 22, 1994, against defendants White Consolidated Industries, Inc., and its Frigidaire division. Defendants will be referred to collectively herein as "WCI," unless the separate conduct of Frigidaire or its employees is at issue. Jones's claims arise from the termination of its distributorship agreement with WCI in 1993. WCI answered the original complaint on May 16, 1994, also asserting a counterclaim for sums due under a statement of account in connection with the distributorship agreement. Jones answered the counterclaim on May 20, 1994. Considerably later, however, on May 29, 1996, Jones moved for leave to amend its complaint. Leave to amend was granted on July 15, 1996. The claims at issue in the first of WCI's motions for summary judgment are those stated in this amended and substituted complaint.

Nine claims are asserted in the amended and substituted complaint. Jones's first cause of action, denominated a cause of action for "breach of contract," asserts that the

entire "1993 Franchise Agreement"[1] between the parties is void as unconscionable. It further contends that if the 1993 Agreement is not void in its entirety, provisions providing for termination without cause are nonetheless void and unenforceable by reason of being unconscionable. Furthermore, this cause of action asserts that the 1993 Agreement, which pertains specifically to distribution of goods in South Dakota, did not terminate those portions of a 1987 agreement concerning distribution of goods in Iowa and Nebraska, as well as South Dakota; consequently, Jones alleges, the termination provisions of the 1987 Agreement are still applicable to distribution of goods in Iowa and Nebraska, and have been breached by WCI's termination of Jones's distributorship. Finally, this cause of action asserts that WCI breached an agreement arising from a course of dealing and performance that granted Jones an exclusive sales territory by selling products within this exclusive territory without compensating Jones and by terminating Jones's distributorship agreement and selling in this territory.

Second, Jones asserts a cause of action for tortious interference with business relationships, premised on WCI's direct dealings with and sales to Jones's customers. Jones therefore asserts that WCI has interfered with the contractual or business relationships between Jones and its customers. Third, Jones asserts violation of the franchise statutes of South Dakota, Nebraska, and Iowa. Fourth, in a cause of action denominated "Fraud, Misrepresentation, Coercion and Duress," Jones asserts a claim of fraudulent misrepresentation premised on WCI's alleged repeated assurances that Jones would always be able to sell Frigidaire products, contrary to WCI's actual termination of its distributorship agreement with Jones. Jones's fifth cause of action alleges "unjust enrichment," and is premised on WCI reaping the benefits of Jones's development of customers for WCI's products in the region

---

1. The 1993 Agreement is so described in Jones's complaint. However, the title of each of the three documents (one each for Tappan, Frigidaire, and White–Westinghouse brands) attached to the complaint as Exhibit C, and purported to make up the 1993 Agreement, is actually "Distributor Sales Agreement." The court will refer to this group of contracts as the "1993 Agreement."

formerly serviced by Jones. Jones's sixth cause of action alleges breach of the implied covenant of good faith and fair dealing in the contract between the parties. The breach of covenant is premised on WCI's alleged termination of "override" payments to Jones for sales made directly by WCI to dealers in Jones's territories and WCI's alleged failure to inform Jones of its plan to terminate Jones and other distributors even while demanding that Jones sign a new distributorship agreement for 1993 which included substantial changes in the termination provisions of the contract. The seventh cause of action in the amended and substituted complaint alleges violation of the anti-trust laws of the states of South Dakota, Nebraska, and Iowa. Jones's eighth "cause of action" is essentially a prayer for compensatory and exemplary damages on each of the prior claims.

Jones's ninth cause of action, added by virtue of its amendment of its original complaint, is a claim of fraudulent non-disclosure. In this cause of action, Jones alleges that in January of 1993, WCI forwarded a new "distributor agreement" to Jones to sign (the document referred to by the court above as the 1993 Agreement) with a cover letter that failed to set forth any significant changes from prior contracts. However, the 1993 Agreement in fact made a significant change to the termination provisions that had been a part of the preceding series of agreements between the parties, because it added a provision permitting termination by WCI without cause. Jones alleges that WCI proffered this new contract without disclosure of the pertinent termination terms although it had known as far back as 1991 that it intended to terminate distributor contracts across the country and had established a task force to discuss and prepare for the contemplated terminations. The task force's preparations are alleged to have included eliminating contractual impediments to the terminations of individual distributors. Jones alleges that "special circumstances" existed between Jones and WCI that gave rise to WCI's duty to disclose the contemplated terminations of distributors. These "special circumstances" include the long-term relationship of the parties and the trust that had developed over numerous years and a prior course of dealing. Jones alleges that the information WCI failed to disclose was material to its signing of the 1993 Agreement, and that Jones relied to its detriment on a continuing relationship when it signed the 1993 Agreement without being advised of or noticing the change in the termination provisions.

Certain of these causes of action need not be discussed further. In its resistance to WCI's motion for summary judgment on Jones's claims, Jones agreed that summary judgment should be granted in favor of WCI on some claims and those claims should therefore be dismissed. Specifically, Jones "does not assert a resistance to the dismissal" of its unjust enrichment claim. Plaintiff's Memorandum In Resistance To Defendant's Motion For Summary Judgment On Plaintiff's Complaint (hereinafter "Jones's Brief On Its Claims"), pp. 21–22. Furthermore, Jones states, "After reviewing the brief of WCI and completing discovery in this case, Jones does not dispute the authorities or evidence cited by WCI" pertaining to the claim of violation of state anti-trust statutes. Jones's Brief On Its Claims, p. 32. In light of the lack of resistance to the motion for summary judgment on these claims, WCI's motion for summary judgment is granted as to Jones's fifth cause of action—which alleges "unjust enrichment"—and Jones's seventh cause of action—which alleges violation of the anti-trust laws of the states of South Dakota, Nebraska, and Iowa.

On August 19, 1996, WCI filed separate motions for summary judgment on Jones's claims and on its own counterclaim for sums due under the distributorship agreement. Jones resisted the motions for summary judgment on September 3, 1996. On September 9, 1996, WCI filed reply briefs in support of both motions for summary judgment. WCI's grounds for summary judgment and Jones's resistances thereto are recounted as to each claim or counterclaim in the pertinent portion of the court's legal analysis. Both parties requested oral arguments on the motions for summary judgment.

In light of the imminence of trial, which is set to begin on October 15, 1996, the court

held expedited oral arguments on the motions for summary judgment on September 10, 1996. Plaintiff Jones Distributing Company was represented at oral arguments by counsel Steven R. Jensen of Crary, Huff, Inkster, Hecht & Sheehan, P.C., in Sioux City, Iowa. Defendants WCI and Frigidaire were represented by counsel Stephen D. Turner and Ellen S. Carmody of Law, Weathers & Richardson, P.C., in Grand Rapids, Michigan.

Before turning to the legal analysis of the motions for summary judgment, the court must first recount the standards applicable to motions for summary judgment, as well as identify the undisputed and disputed facts in the case.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2554–55); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim, counterclaim, or cross-claim is asserted or a declaratory judgment is sought may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)).[2] A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party, here Jones, and give Jones the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89

---

2. An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1280 (8th Cir.1996); *Marts v. Xerox, Inc.*, 77 F.3d 1109, 1112 (8th Cir.1996); *Munz*, 28 F.3d at 796; *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992).

Procedurally, WCI bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir.1993). WCI is not required by Rule 56 to support its motions for summary judgment on both Jones's claims and its own counterclaim with affidavits or other similar materials negating the opponent's claim. *Id.*

■ "When a moving party has carried its burden under *Rule* 56(c), its opponent must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S.Ct. at 1356. Jones is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach*, 49 F.3d at 1325. Although "direct proof is not required to create a jury question, ... to avoid summary judgment, 'the facts and circumstances relied upon must attain the dignity of substantial evidence and must not be such as merely to create a suspicion.'" *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985) (quoting *Impro Prods., Inc. v. Herrick*, 715 F.2d 1267, 1272 (8th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1282, 79 L.Ed.2d 686 (1984)), *cert. denied sub nom. Metge v. Bank-*

*ers Trust Co.*, 474 U.S. 1057, 106 S.Ct. 798, 88 L.Ed.2d 774 (1986). The necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Allison*, 28 F.3d at 66.

In *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2510–11, *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2552–53, and *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. at 1355–56, the Supreme Court established that a summary judgment motion should be interpreted by the trial court to accomplish its purpose of disposing of factually unsupported claims, and the trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial. *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir.1990). The trial court, therefore, must "assess the adequacy of the nonmovants' response and whether that showing, on admissible evidence, would be sufficient to carry the burden of proof at trial." *Hartnagel*, 953 F.2d at 396 (citing *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552). If Jones fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then WCI is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2552; *Woodsmith*, 904 F.2d at 1247. However, if the court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment should not be granted. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510; *Burk*, 948 F.2d at 492; *Woodsmith*, 904 F.2d at 1247. With these standards in mind, the court turns to consideration of the disputed and undisputed facts that form the factual background to the claims and counterclaim of the parties and WCI's two motions for summary judgment.

### III. FACTUAL BACKGROUND

#### A. Undisputed Facts

The record reflects that the following facts are undisputed. Plaintiff Jones Distributing Company is a closely-held Iowa corporation that was, until recently, involved in the re-

gional distribution of appliances, primarily those manufactured by WCI, to a dealer network. Defendant WCI is a Delaware corporation with its principal place of business in Cleveland, Ohio. WCI is a wholly owned subsidiary of A.B. Electrolux Corporation, a Swedish corporation. WCI is a diversified manufacturing company, which, through its Frigidaire Division, manufactures and sells major home appliances under various brand names, including Frigidaire, White–Westinghouse, Kelvinator, Gibson, and Tappan. As WCI acquired these various brands, it initially maintained separate sales organizations for each of them. However, the various sales organizations were consolidated in 1991.

Jones first became associated with Frigidaire in 1973 when Frigidaire was a subsidiary of General Motors. In May of 1973, Jones entered into a "Distributor Sales and Service Agreement" with Frigidaire to distribute and service Frigidaire appliances. Jones first became associated with WCI when WCI acquired Frigidaire in 1979. From 1979 until the spring of 1994, the focus of Jones's business was the distribution of Frigidaire appliances,[3] although it also sold other brands not associated with WCI.

Jones and Frigidaire (as a division of WCI) entered into a series of agreements for the sale and service of Frigidaire appliances in January of 1981, January of 1984, and January of 1987. None of these agreements with WCI referred to the relationship between WCI and Jones as a "franchise," although that term had occasionally been used in prior contracts with Frigidaire. Under the 1981, 1984, and 1987 agreements, WCI granted Jones a "nonexclusive" distributorship. In other words, Jones had the right to distribute other companies' products, and in fact did so; additionally, WCI had the right to sell directly to dealers or other customers in Jones's designated territory, which it also in fact did do. Although the contracts provided that WCI could make sales direct to dealers, WCI usually paid "overrides" to distributors for some sales WCI made to dealers within the distributor's territory. In 1991, however, WCI discontinued payment of overrides to

Jones for sales WCI made directly to Nebraska Furniture Mart, which otherwise would have been sales in Jones's territory.

Each of the contracts for 1981, 1984, and 1987 was a standard form contract presented by WCI to Jones for Jones to sign without negotiation of specific terms other than designated territory. Jones's designated territory under these agreements included most of the counties of South Dakota and several counties in Iowa and Nebraska.

Although the 1981 and 1984 agreements were for a specific duration, the 1987 agreement was of indefinite duration, providing that it could be terminated by mutual consent of the parties, voluntarily by Jones, for cause by WCI, or by proffer by WCI of a superseding distributorship agreement. Specifically, the 1987 Agreement provided as follows:

> The terms of this Agreement shall commence on the effective date first set forth herein above and, subject to its earlier termination in accordance with the provisions of Section 15 of this Agreement, continue until superseded by revision of execution of a new Agreement.

> In the event a new and superseding form of Frigidaire Products Distributor Sales Agreement is offered by Frigidaire to Authorized Frigidaire Products Distributors at any time while this Agreement is in effect, Frigidaire may terminate this Agreement by prior written notice to Distributor, provided Frigidaire offers Distributor such new and superseding form of Frigidaire Products Distributor Sales Agreement to replace existing Agreement.

Defendant's Exhibit 6A, 1987 Agreement, ¶ 5. The 1981, 1984, and 1987 agreements otherwise had identical provisions for termination. Each allowed Jones to terminate voluntarily, but stated that WCI could terminate unilaterally only for certain specified causes. Those specified causes included the failure to perform under the agreement, or termination, death, or incapacity of the primary manager of Jones. The agreements could also each be terminated by mutual

---

**3.** It appears from the record that by "focus" of Jones's activities, upwards of seventy-five percent of Jones's business was based on the WCI brands.

consent. Each of the agreements executed in 1981, 1984, and 1987 provided for distribution only of Frigidaire brand products. However, beginning in about 1990, Jones also began to distribute other WCI brands, specifically, Tappan and White–Westinghouse.

In December of 1992, WCI sent Jones another distributor sales agreement to become effective January 1, 1993 (the "1993 Agreement") that WCI intended to supersede the 1987 Agreement. The 1993 Agreement is in fact three separate form contracts, otherwise identical, for Frigidaire, Tappan, and White–Westinghouse products. Thus, the 1993 Agreement for the first time specifically covers Jones's authority to distribute brands other than Frigidaire. The cover letter accompanying the proffered 1993 Agreement explained that there were separate contracts for Frigidaire, White–Westinghouse, and Tappan products, requested that Jones "read and verify all the typed data to be sure that it is correct," requested that the appropriate officer execute the contracts, and closed with "[t]hanks for helping update our document files." Plaintiff's Exhibit N. The cover letter does not identify any changes in the document from previous standard form agreements.[4] The "typed data" referred to in the cover letter includes the portions of the three separate contracts that identify the distributor, the brand in question, and the "Area of Primary Responsibility." Each brand contract in the 1993 Agreement identifies only counties in South Dakota as Jones's "Area of Primary Responsibility." Stewart Hartman did not immediately sign the contract on behalf of Jones. Instead, Hartman signed the 1993 Agreement on March 28, 1993.

In his deposition, Hartman states that he did not read carefully the entire 1993 Agreement and did not have it reviewed by counsel prior to signing it. However, the delay in signing the 1993 Agreement, at least in part, resulted from Hartman's concern that the 1993 Agreement listed only South Dakota counties as Jones's "Area of Primary Responsibility." Because the parties dispute other factual matters concerning the signing of the 1993 Agreement, the court passes on to the undisputed contents of that agreement.

The 1993 Agreement provides for termination upon the mutual consent of the parties, and for termination by Frigidaire upon the happening of certain specified events, as had prior agreements. However, it also contains a new provision, in Section V(b), which provides for termination by either party, not just Jones, without cause. The pertinent provision is as follows:

**V. Duration and Termination**

This Agreement shall be in effect from the date of execution until terminated as provided herein:

$$* \quad * \quad * \quad * \quad * \quad *$$

(b) This Agreement may be terminated by either party at any time, with or without cause, subject however, to the applicable provisions of state laws, if any, upon giving of sixty (60) days prior written notice by certified mail to the other party.

$$* \quad * \quad * \quad * \quad * \quad *$$

1993 Agreement, p. 6 (in each brand contract). No representative of Jones either noticed or questioned this new provision prior to signing the 1993 Agreement.

At the end of 1993, WCI delivered notices of termination to approximately 20 independent distributors, including Jones. Jones's

---

4. The body of the cover letter, dated December 29, 1992, to Stewart Hartman of Jones Distributing, and signed by Caroll B. Wood, Vice President, Distributor Operations of Frigidaire, is as follows:

We are pleased to enclose six copies of our new Frigidaire Company "Distributor Sales Agreement"—two for Frigidaire, two for White–Westinghouse and two for Tappan Products.

The new Sales Agreements have been executed in your name and your area of primary responsibility effective January 1, 1993. Please read and verify all of the typed data to be sure that it is correct.

We ask that an officer of your company sign the six copies, have someone witness these signatures and then return all signed copies to me in the enclosed envelope.

We will sign the copies and return one agreement for each brand for your file.

If you have any questions, please call me. Thanks for helping update our document files. Plaintiff's Exhibit N.

termination was to become effective March 31, 1994.[5] Currently, WCI uses independent distributors only for its Gibson brand. The parties agree that WCI had been evaluating the possible termination of independent distributors in favor of direct sales to dealers for some years. They disagree, however, as to precisely when the decision was made to terminate Jones, and specifically, whether that decision was made prior to proffering Jones the 1993 Agreement.

### B. Disputed Facts

The record demonstrates that the following facts are in dispute. The question to be addressed below, in the court's legal analysis, is whether these disputes of fact are material under the governing law, such that they preclude summary judgment on any of Jones's claims. *See, e.g., Fed.R.Civ.P.* 56(c); *Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

The first dispute of fact asserted by Jones pertains to the circumstances under which Stewart Hartman eventually signed the 1993 Agreement. As indicated above, there is no dispute that Hartman did not read carefully the entire 1993 Agreement; nor is there any dispute that he did not have counsel review the document, or that no representative of Jones noticed or questioned the new termination provision. Furthermore, the parties agree that Hartman's three-month delay in signing the 1993 Agreement was at least in part the result of concerns over the apparent change in Jones's "Area of Primary Responsibility" to include only South Dakota counties, not the counties it had previously serviced in Iowa and Nebraska. Jones contends that Hartman contacted Jeff Baker of Frigidaire to ask about the apparent change in territory, but was assured that Jones could sell anywhere and not to worry about the designated territory. Jones contends further that Baker contacted Hartman in March of 1993 to ask why the 1993 Agreement had never been signed. Jones contends that Baker told Hartman that if the various contracts constituting the 1993 Agreement were not signed and returned immediately, "Jones would be cut off" from receiving further appliances from Frigidaire. Only then did Hartman sign and return the 1993 Agreement. WCI contends that Jones made no contact with WCI or Frigidaire personnel to clarify any aspect of the 1993 Agreement prior to signing it.

Jones contends that Hartman's contact with Baker also demonstrates that there is a genuine issue of material fact as to whether the parties intended the 1993 Agreement to supersede the 1987 Agreement as to the Iowa and Nebraska counties Jones serviced under the 1987 Agreement. However, WCI points to the language of the 1993 Agreement, which states that it supersedes all prior agreements as to the "products" in question as establishing beyond dispute that the 1993 Agreements, covering all WCI "products" Jones distributed, superseded entirely the 1987 Agreement. WCI specifically contends that the 1993 Agreement was intended to change Jones's territory by limiting it to South Dakota.

Jones also contends that there is a genuine issue of material fact as to WCI's plans to

---

**5.** The termination letter, Exhibit D to Jones's Complaint, is dated December 6, 1993, is directed to Stewart Hartman of Jones, and is signed by Caroll B. Wood, Vice President, Independent Distributors for Frigidaire. The body of that letter states the following:

> After a thorough analysis of Frigidaire Company's present independent distributor organization, a decision has been made to phase out a large number of distributors, including all Frigidaire and Tappan brand distributors, in the continental United States.
> Therefore, reference is made to Frigidaire Company Distributor Sales Agreement with Jones Distributing Company Inc. for Frigidaire products dated January 1, 1993.

> Pursuant to paragraph V(b) thereof, notice is hereby given that said Agreement is terminated effective March 31, 1994.
> Your Frigidaire Company Zone Manager will work with you prior to the effective termination date to arrange an orderly transfer of the line from Jones Distributing Company Inc. to our direct sales organization.
> During the interim notification period, if you have any questions, please contact your Zone Manager, your Sales Operation General Manager or me.

Plaintiff's Complaint, Exhibit D.

terminate distributors. Jones contends that the president of Frigidaire established a "task force" in 1991, headed by Caroll Woods, to evaluate the existing distributorship method and the possible termination of existing distributorship agreements. Jones contends, on the basis of documents obtained in discovery, that the task force held several meetings and that participants were specifically instructed to keep their activities confidential and maintain a "business-as-usual" face on things. Jones further asserts that the documents obtained in discovery demonstrate that WCI established a detailed plan for termination of distributors, including assessment of potential litigation costs, the effect of the termination on specific distributors, and the need to change the contracts in force with distributors to include "without cause" provisions. Jones contends that this documentary evidence and deposition testimony of certain Frigidaire employees raise a genuine issue of material fact as to the truthfulness of Caroll Woods' assertions that there were no discussions in the task force Woods headed concerning terminations of specific distributors until the late summer or fall of 1993. WCI asserts that the record demonstrates that the task force decided to terminate only distributors in populated areas in 1991, but that the termination of rural distributors, such as Jones, lay dormant until 1993. In fact, WCI asserts that its task force specifically determined that rural distributors should be maintained during review of the status of distributorships in 1992. WCI specifically denies that any decision was made to terminate Jones until shortly before WCI actually sent Jones the termination letter in December of 1993.

## IV. LEGAL ANALYSIS

As the court observed above, Jones does not resist WCI's motion for summary judgment on Jones's claims of unjust enrichment or violation of state antitrust laws. Summary judgment in WCI's favor will therefore

be granted on these claims, and they will be dismissed from the action. The remaining claims, however, must be considered in more detail.

### A. Violation Of Franchise Laws

■ The court's legal analysis begins with Jones's claim that WCI violated the franchise laws of the states of South Dakota, Iowa, and Nebraska. WCI contends that all three of the state franchise acts it is alleged to have violated require, as a prerequisite to suit, a showing that Jones has paid a franchise fee. Jones concedes as much.[6] WCI contends that it is undisputed that Jones never paid a direct franchise fee. Furthermore, WCI contends that any of several "indirect" franchise fees it anticipates Jones might assert were paid were nothing more than normal business expenses. WCI opines that Jones might assert indirect franchise fees on the basis of claims that (1) it was forced to pay higher prices for product than certain dealers were paying; (2) it was required to train employees at approved WCI training facilities at Jones' expense; (3) it was required to participate in advertising of WCI products; (4) it was required to maintain certain excess amounts of inventory; and (5) it was required to maintain offices and warehouses within the states of Nebraska, Iowa, and South Dakota, where it had to rent or lease showroom space, citing Stewart Hartman's deposition testimony. WCI cites contrary portions of the record indicating that the asserted "fee" either was not incurred or would have been incurred in the normal course of WCI's business.

Jones's resistance to summary judgment on these claims of violation of franchise laws, in its entirety, is as follows:

WCI apparently agrees that Jones can establish a claim under either the Iowa, South Dakota or Nebraska franchise statutes upon sufficient showing of franchise fee [sic]. Based upon WCI's brief, Jones does not believe that WCI is otherwise

---

6. Jones could do little else. Iowa Code § 523H.1(3)(a)(1)(b) provides that a franchise "[r]equires payment of a franchise fee to a franchisor or its affiliate," while subsection 523H.1(4) provides that a "franchise fee" "means a direct or indirect payment to purchase

or operate a franchise," and further specifies things that are *not* indirect franchise fees. South Dakota and Nebraska laws are similar. S.D. Codified Laws §§ 37–5A–1(3) & 37–5A–3; Neb. Rev.Stat. §§ 87–402(5) & 87–403.

contesting the franchise claim on summary judgment. Jones does not dispute that it is necessary under Iowa law and the other applicable statutes to show that a franchise fee existed in order to make a claim under the Iowa or other states['] franchise statutes.

Based upon a review of WCI's brief, Jones does not believe that the court can grant summary judgment as a matter of law. Jones believes that each of these claims as to whether they constitute an indirect franchise fee or a requirement of business are issues of fact which should be determined at the time of trial. Jones requests that the court deny summary judgment on the indirect franchise fee to permit it to present evidence at the time of trial on this issue. Based upon the state of the record as set forth in WCI's brief, Jones does not believe that summary judgment is appropriate on the franchise fee issue.

Jones's Brief On Its Claims, p. 22. The court has reviewed Jones's statement of facts and all of the appended documents, but finds no reference anywhere to asserted indirect franchise fees. Furthermore, Jones's argument in support of its franchise law claims fails to rebut any of WCI's contentions that the possible "indirect" franchise fees WCI suggested Jones might raise was anything but a normal business expense.

Jones has therefore failed to meet its burden in resisting summary judgment. As to the franchise law claims, WCI has more than met its "initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53); *see also Reed,* 7 F.3d at 810. However, this appears to be a case in which Jones is relying on no more than a "metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356. Once again, Jones is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," *designate,* that is, "set forth," "specific facts showing that there is a genuine

issue for trial." *Fed.R.Civ.P.* 56(e); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin,* 50 F.3d at 511; *Beyerbach,* 49 F.3d at 1325. Here, Jones has offered nothing like facts and circumstances that attain the dignity of "substantial evidence," and instead relies upon comments that, at best, " 'merely ... create a suspicion,' " if, indeed, they go so far. *Metge,* 762 F.2d at 625 (quoting *Impro Prods., Inc.,* 715 F.2d at 1272). No "reasonable jury," the court finds, based on the bald and unsupported comments Jones has offered in its brief, "could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Allison,* 28 F.3d at 66. Because Jones has failed to make a sufficient showing of an essential element of its claim of violation of franchise laws, WCI is "entitled to judgment as a matter of law" on that claim. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53; *Woodsmith,* 904 F.2d at 1247.

### B. Choice Of Law On Tort And Contract Claims

█ The remaining claims are therefore "contract" and "tort" claims. The court has twice in recent years confronted the often knotty problem of what law applies to specific common-law claims in a diversity action. *See Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F.Supp. 1400 (N.D.Iowa 1995); *Curtis 1000, Inc. v. Youngblade,* 878 F.Supp. 1224, 1251–54 (N.D.Iowa 1994). To resolve the issue of which state's law applies to Jones's claims, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws or choice-of-law rules. *Harlan Feeders, Inc.,* 881 F.Supp. at 1403–04 (citing, *inter alia, Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941)). Furthermore, the first step in determining any choice-of-law question is to determine the proper characterization of what kind of case is involved, and the law of the forum controls this question as well. *Id.* at 1404. In this case, the court is presented with both contract claims—Jones's claims of breach of contract,

unconscionability, and breach of covenant of good faith and fair dealing—and tort claims—Jones's claims of fraudulent misrepresentation, fraudulent non-disclosure, and interference with business relationships. The parties agree that Ohio law, the chosen law of the contract, applies to Jones's contract claims, while Iowa law applies to the tort claims. The court concurs on the basis of the factors and tests set forth more fully in *Harlan Feeders* and *Curtis 1000*. Therefore, the court may turn to disposition of the motions for summary judgment on the various claims guided by the appropriate body of substantive state law.

### C. Contract Claims

Jones asserts three separate, but sometimes interrelated contract claims: unconscionability, breach of contract, and breach of covenant of good faith and fair dealing. The court begins its discussion with the unconscionability claim, because the breach of contract claim or claims in part depend upon the question of unconscionability of the "without cause" termination clause of the 1993 Agreement.

### 1. Unconscionability

■ Jones's first cause of action, *inter alia,* asserts that the entire 1993 Agreement between the parties is void as unconscionable. It further contends that if the 1993 Agreement is not void in its entirety, provisions providing for termination without cause

are nonetheless void and unenforceable by reason of being unconscionable. The parties appear to agree that the Uniform Commercial Code (UCC) governs the question of the unconscionability of a clause of a distributorship contract. WCI has moved for summary judgment on Jones's unconscionability claim on several grounds. First, WCI argues that unconscionability is rarely found in commercial contracts. Next, WCI argues that the "without cause" clause is neither procedurally nor substantively unconscionable, because Jones had over three months to decide whether or not to enter into the contract, and no court has held that a mutual "without cause" termination clause is substantively unconscionable. Although Jones agrees with WCI that the court determines unconscionability as a matter of law, it argues, in the first instance, that the court should not make such a determination until the parties have been afforded a full hearing to show unconscionability, which should include evidence of the commercial setting, purpose, and effect of the clause in question. Furthermore, Jones argues, courts have found various contract clauses unconscionable in a commercial setting, asserting that procedural unconscionability can be outcome-determinative of substantive unconscionability. Furthermore, Jones contends that, in the circumstances, it had no meaningful choice but to accept the 1993 Agreement and that the "without cause" termination clause was unreasonably favorable to WCI.[7]

---

7. It is undisputed that neither Hartman nor any other representative of Jones read the contract containing the allegedly unconscionable terms prior to signing it. Under Ohio law, a party's failure to read a contract without some excuse for that failure precludes a party from being excused from the terms of the contract. *See, e.g., P & O Containers, Ltd. v. Jamelco, Inc.,* 94 Ohio App.3d 726, 641 N.E.2d 794, 799 (1994) (a party's failure to read the terms of a bill of lading was not excused by any facts of record and did not permit the party to be excused from the terms of the contract as unconscionable, even though the print of the contract was small, where the print was legible, the language was understandable, and both parties were commercially sophisticated; the court remarked, "A party's duty to read terms of a contract before entering into it depends on the facts of the specific case," and those factors included commercial sophistication); *Campco Distributors, Inc. v. Fries,* 42 Ohio App.3d 200, 537 N.E.2d 661, 664 (1987) (in

the absence of fraud or mutual mistake a contract is binding upon the parties even if one of the parties did not read the contract or make a reasonable effort to learn what was in it); *Independent Directory Corp. v. Vandenbrock,* 94 N.E.2d 228 (Ohio Ct.App.1950) (a party who signs a contract without first making a reasonable effort to learn its contents cannot avoid that contract or its obligations in the absence of fraud or mutual mistake); *but see Young v. Glaze,* 66 Ohio Misc.2d 74, 643 N.E.2d 186, 189 (Ohio Mun.1994) (entertaining a claim of unconscionability despite failure of the party asserting the claim to read the contract). WCI has not alleged Hartman's failure to read the contract as a bar to Jones's unconscionability claim. Furthermore, Jones has indeed alleged fraud in the inducement to the contract, thus escaping the bar on assertion of an unconscionability claim under Ohio law. The court will therefore consider Jones's unconscionability claim.

### a. Ohio law of unconscionability

■ Under Ohio law, whether or not a contract or contractual provision is unconscionable is a question for the court to determine as a matter of law. OHIO REV.CODE § 1302.15 (UCC 2–302). "Unconscionability is generally recognized to include an absence of meaningful choice on the part of one of the parties to a contract, combined with contract terms that are unreasonably favorable to the other party." *Collins v. Click Camera & Video, Inc.*, 86 Ohio App.3d 826, 621 N.E.2d 1294, 1299 (1993); *Orlett v. Suburban Propane*, 54 Ohio App.3d 127, 561 N.E.2d 1066, 1069 (1989); *see also* OHIO REV.CODE § 1302.15 (UCC 2–302), Official Comment (a contractual clause is "unconscionable" only where it is so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract). Thus, under Ohio law, two factors must be present in order to establish that a contract or one of its provisions is unconscionable: (1) the terms of the contract are unfair and unreasonable, *i.e.*, the terms are "substantively unconscionable," and (2) the individualized circumstances of the parties were such that no voluntary meeting of the minds was possible, *i.e.*, there was "procedural unconscionability." *Collins*, 621 N.E.2d at 1299. "One must allege and prove a 'quantum' of both prongs in order to establish that a particular contract is unconscionable." *Id.* (quoting WHITE & SUMMERS, UNIFORM COMMERCIAL CODE, 219, § 4–7 (1988)).

The Ohio Court of Appeals has clarified these two requirements as follows:

> Substantive unconscionability involves those factors which relate to the contract terms themselves and whether they are commercially reasonable. Because the determination of commercial reasonableness varies with the content of the contract terms at issue in any given case, no generally accepted list of factors has been developed for this category of unconscionability. . . .
>
> Procedural unconscionability involves those factors bearing on the relative bargaining position of the contracting parties, e.g., age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, whether there were alternative sources of supply for the goods in question.

*Collins*, 621 N.E.2d at 1299 (internal quotation marks and citations omitted). As to procedural unconscionability, in *Collins*, the Ohio court held that where the assertedly weaker party had extensive business education and experience, and saw, but failed to read, the clause in question, even assuming that the clause could not have been bargained over, the inability to bargain alone was insufficient to establish procedural unconscionability. *Id.* at 835, 621 N.E.2d at 1300 (citing *Richard A. Berjian, D.O., Inc. v. Ohio Bell Tel. Co.*, 54 Ohio St.2d 147, 8 O.O.3d 149, 375 N.E.2d 410, 416 (1978)). The court was also persuaded to find no unconscionability in a limitations clause by the fact that there were certainly other places the plaintiff could have gone for services, and by the lack of evidence that no one would have been willing to negotiate with the plaintiff over the clause he complained of, even though such clauses were standard in the industry. *Id.*

Some time ago, the Ohio Court of Appeals established further requirements for a showing of unconscionability:

> Our research on the problem makes clear that the unconscionability of a clause is to be judged not in the abstract, but rather in its commercial setting. We believe that in order to prove unconscionableness in the termination clause, there must be a showing, not only that the terms thereof are onerous, oppressive or onesided, but also that the terms bear no reasonable relation to the business risks; the showing depends on the commercial environment and cannot be made from the face of the contract alone. We are of the further opinion that, under these circumstances, a hearing should be had to make such determination, and that such a hearing is mandatory rather than discretionary once the trial court accepts a possibility of unconscionability.

*Central Ohio Co-operative Milk Producers, Inc. v. Rowland*, 29 Ohio App.2d 236, 58

O.O.2d 421, 281 N.E.2d 42, 44 (1972). The court of appeals therefore reversed the district court's summary judgment finding that the termination clause of the contract in question was unconscionable, because such a finding was made without an evidentiary hearing to determine the commercial setting, purpose, and effect of the clause as required by OHIO REV.CODE § 1302.15(B).[8] *Id.* at 240, 281 N.E.2d at 45–45.

These or very similar principles have been applied by other courts specifically considering the unconscionability of termination clauses in distributorship agreements. For example, in *Highway Equip. Co. v. Caterpillar, Inc.*, 908 F.2d 60 (6th Cir.1990), the Sixth Circuit Court of Appeals, applying Illinois law, held that "[t]o be unconscionable, a contract must be one 'which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man could accept, on the other.'" *Highway Equip.*, 908 F.2d at 65 (quoting *Neal v. Lacob*, 31 Ill.App.3d 137, 334 N.E.2d 435, 439 (1975), in turn quoting *Hume v. United States*, 132 U.S. 406, 410, 10 S.Ct. 134, 136, 33 L.Ed. 393 (1889)). The court found that the test poses "a very great burden," and that the plaintiff distributor in the case before it had not met that burden. *Id.* The court considered elements of both procedural and substantive unconscionability, because it noted the substantive fairness of the termination-at-will provision as giving the parties "equal rights," and the procedural fairness of the provision in light of the business sophistication of the distributor's representative. *Id.* Similarly, the Seventh Circuit Court of Appeals has recognized that

> Indiana courts have defined an unconscionable contract as "one which contains unreasonable or unknown terms *and* is the product of inequality of bargaining power." *See [Piskorowski v. Shell Oil Co.,* 403 N.E.2d 838,] 846–47 [ (Ind.Ct.App.1980) ] (citing *Weaver v. American Oil Co.,* 257 Ind. 458, 276 N.E.2d 144 (197[1] )) (emphasis in original). This definition makes clear that there are two conjunctive ele-

ments of an unconscionability claim: one substantive, the other procedural, where substantive unconscionability refers to the content of the contract and procedural unconscionability refers to the circumstances under which the contract was negotiated and signed.

*Communications Maintenance, Inc. v. Motorola, Inc.,* 761 F.2d 1202, 1209 (7th Cir.1985). The appellate court upheld the district court's finding of no substantive unconscionability, and therefore did not reach the issue of whether there was procedural unconscionability, thus indicating that both elements must be shown. *Id.* at 1210; *see also Pennington's, Inc. v. Brown–Forman Corp.,* 785 F.Supp. 1412, 1415–16 (D.Mont.1991) (attempting to determine what Montana law of unconscionability would be as to a termination clause in a distributorship agreement that provided for termination without cause upon thirty days' notice, and examining both procedural unconscionability, in terms of surprise and bargaining power, and substantive unconscionability, in terms of reasonableness), *aff'd,* 2 F.3d 1157 (9th Cir.1993) (Table decision); *Oreman Sales, Inc. v. Matsushita Elec. Corp.,* 768 F.Supp. 1174, 1182 (E.D.La. 1991) (under Louisiana law, a party asserting unconscionability of a termination clause in a distributorship agreement must show both substantive and procedural unconscionability); *General Aviation, Inc. v. Cessna Aircraft Co.,* 703 F.Supp. 637, 646 (W.D.Mich. 1988) (considering both substantive and procedural unconscionability of a termination clause in a distributorship contract), *aff'd in part and rev'd in part on other grounds,* 915 F.2d 1038 (6th Cir.1990) (unconscionability not at issue on appeal); *Blalock Machinery & Equip. Co., Inc. v. Iowa Mfg. Co. of Cedar Rapids, Iowa,* 576 F.Supp. 774, 778 (N.D.Ga. 1983) (elements of unconscionability claim are proof (1) that plaintiff "had no meaningful choice but to deal with the defendant and accept the contract as offered and (2) the termination clause was unreasonably favorable to the defendant," citing *Corenswet, Inc.*

---

8. Section 1302.15(B) of the Ohio Code provides as follows:

> When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose, and effect to aid the court in making the determination.

*v. Amana Refrigeration, Inc.,* 594 F.2d 129, 139 (5th Cir.), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979)).[9]

### b. Unconscionability here

■ Looking to the first prong of the test applied by the Ohio courts, the court finds that the mutual "without cause" or "at-will" termination clause is not substantively unconscionable on its face. Indeed, courts have uniformly rejected claims of unconscionability of at-will termination clauses in distributorship agreements. *See Highway Equip. Co.,* 908 F.2d at 65 (finding that the at-will termination provision in a distributorship agreement was not substantively unconscionable, because it gave the parties "equal rights," allowing the distributor to switch over to a competitor's equipment if the manufacturer's products were selling slowly; the court observed that the distributor's position "would invalidate thousands of similar termination-at-will clauses in existing contracts," and concluded, "The mutual, no-cause termination clause [was] fair on its face and [was] not voidable."); *Communications Maintenance, Inc.,* 761 F.2d at 1209–10 (the district court properly held that a thirty-day notice of termination provision was not substantively unconscionable, because it found that thirty days was reasonable and adequate notice, and was supported by its prior holding that a twenty-eight day notice of termination provision in a distributorship agreement of indefinite duration was reasonable under Indiana's version of the UCC, Ind.Code 26–1–2–309, citing *Rockwell Eng'g Co., Inc. v. Automatic Timing & Controls Co.,* 559 F.2d 460, 463 (7th Cir.1977)); *Walker v. U–Haul Co. of Mississippi,* 734 F.2d 1068, 1075 (5th Cir. 1984) (the district court held that a termination provision in a distributorship agreement that provided for termination "for any reason" was not unconscionable, and the plaintiff distributor did not challenge that decision on appeal; however, the court characterized its prior holding in *Corenswet, infra,* as holding that "a manufacturer may act arbitrarily in terminating a business relationship with a distributor, if arbitrariness is authorized by a contractual provision"); *Corenswet, Inc. v. Amana Refrigeration, Inc.,* 594 F.2d 129, 138–39 (5th Cir.) (applying Iowa law, the court observed that the UCC "does not *ipso facto* bar unilateral arbitrary terminations of distributorship agreements," and found that unrestricted termination clauses "can have the salutary effect of permitting parties to end a soured relationship without consequent litigation. Indeed when, as here, the power of unilateral termination without cause is granted to both parties, the clause gives the distributor an easy way to cut the knot should he be presented with an opportunity to secure a better distributorship

9. In an unpublished decision applying Montana and California law, the Ninth Circuit Court of Appeals recently found an at-will termination clause in a distributorship contract was neither procedurally nor substantively unconscionable. *Pennington's, Inc. v. Brown–Forman Corp.,* 2 F.3d 1157, 1993 WL 306155 (9th Cir.1993) (Table decision; full text in Westlaw). Although the court's opinion is unpublished, its analysis is insightful. The court found that procedural unconscionability consists of "an absence of meaningful choice by one party due to oppression and surprise," while substantive unconscionability occurs when the contract terms "result in overly harsh or one-sided results, or when the risks of the bargain are allocated in an objectively unreasonable or unexpected manner." *Pennington's, Inc.,* 1993 WL 306155 at **2. The court found that the distributor was not surprised by the at-will termination clause, even where it was "hidden in a prolix printed form, where the distributor never claimed it was unaware of the termination provision, and failed to demonstrate oppression, because he was a sophisticated businessman, had entered distributorship agreements in the past, and failed to explain why he could not reject the contract and enter into a distributorship agreement with another manufacturer. *Id.* at **3 (citing *Premier Wine & Spirits v. E & J Gallo Winery,* 644 F.Supp. 1431, 1440 (E.D.Cal.1986), as holding that a distributor with alternate product line choices is not oppressed, and *Sports and Travel Marketing, Inc. v. Chicago Cutlery Co.,* 811 F.Supp. 1372, 1380 (D.Minn.1993), for the proposition that a distributor did not lack a meaningful choice to reject a contract because it was free to contract with other manufacturers). The court held the distributorship agreement was not substantively unconscionable, because, "[f]ar from being one-sided, it reasonably allocate[d] the potential risk of unprofitability between the two parties," and, because of the mutuality of the at-will termination clause, "placed [the distributor] in a desirable position because it had the option of entering into a more advantageous contract with another manufacturer at any time." *Id.* at **3 (citing *Gilchrist Machinery Co., Inc. v. Komatsu Am. Corp.,* 601 F.Supp. 1192, 1201 (S.D.Miss. 1984), and *Corenswet, Inc.,* 594 F.2d at 138–39).

from another manufacturer"; the court found that the contract expressly permitted the manufacturer to terminate the distributor without cause, and therefore the distributor had not shown the likelihood of success on the merits necessary to support a preliminary injunction), *cert. denied,* 444 U.S. 938, 100 S.Ct. 288, 62 L.Ed.2d 198 (1979); *Pennington's, Inc.,* 785 F.Supp. at 1416 (finding a termination clause in a distributorship agreement was not substantively unconscionable, "since it provided both parties to the agreement the same right to terminate without cause on thirty day's notice."); *Oreman Sales,* 768 F.Supp. at 1182 ("[A]ffording the same rights of termination to either side, the clause does not favor either side; while the termination here may have *adversely* affected Oreman more than Panasonic, it does not follow—especially when viewed from the time the agreement was made—that the *clause* itself thus *favors* Panasonic. As the numerous cases ... upholding substantively identical termination clauses show, the clause is not so one-sided as to be unreasonable. In sum, no jury could find the clause unconscionable"; emphasis in the original, quotation marks and citations omitted); *General Aviation, Inc.,* 703 F.Supp. at 646 (both parties had an unrestricted right under the agreement to decline to renew without cause); *Premier Wine & Spirits,* 644 F.Supp. at 1438 (also upholding the substantive fairness of a termination clause in a distributorship agreement that provided for termination without cause upon thirty day's notice); *Blalock Machinery & Equip. Co., Inc.,* 576 F.Supp. at 778 (a termination clause was not "unreasonably favorable" to the manufacturer where it gave either party the power unilaterally to terminate the contract upon thirty days' notice).

Here, the "without cause" termination clause is indeed mutual, granting WCI for the first time the same power of termination at will that Jones had enjoyed in prior contracts. The decisions above specifically demonstrate the fairness and commercial reasonableness of such a termination clause in a distributorship agreement, because it gives the parties "equal rights" to terminate their relationship. Furthermore, even in light of the circumstances alleged by Jones, the fact that the "without cause" termination clause might have adversely affected Jones more than WCI does not establish that the clause unreasonably favored WCI. *Compare Oreman Sales,* 768 F.Supp. at 1182 ("[A]ffording the same rights of termination to either side, the clause does not favor either side; while the termination here may have *adversely* affected Oreman more than Panasonic, it does not follow—especially when viewed from the time the agreement was made—that the *clause* itself thus *favors* Panasonic"; emphasis in the original, quotation marks and citations omitted). In the circumstances in which Jones alleges it feared termination by WCI, it enjoyed the right under the mutual "without cause" termination provision to seek a relationship with another manufacturer. This court agrees with the district court in *Oreman,* that "As the numerous cases ... upholding substantively identical termination clauses show, the clause is not so one-sided as to be unreasonable. In sum, no jury could find the clause unconscionable." *Id.*

Because the court finds no showing can be made as to the substantive unconscionability of the contract clause providing that either party could terminate the distributorship agreement without cause upon sixty days notice, and some showing on this prong is required, *Collins,* 621 N.E.2d at 1299, the court need not consider whether Jones can make an adequate showing of procedural unconscionability. Nor need the court grant Jones an evidentiary hearing prior to granting summary judgment in favor of WCI on the unconscionability claim, because the court cannot find that the prerequisite for such a hearing—the trial court's acceptance of a possibility of unconscionability—has been shown. *Central Ohio Co-operative Milk Producers, Inc.,* 281 N.E.2d at 44; *see also Communications Maintenance, Inc.,* 761 F.2d at 1210 (where the court found no genuine issue of material fact of substantive unconscionability, it never reached the question of procedural unconscionability, but upheld the district court's summary judgment dismissing the unconscionability claim); *Blalock Machinery & Equip. Co., Inc.,* 576 F.Supp. at 778 (unconscionability is a question of law that may properly be decided on

**1464**

summary judgment). As in *Walker*, where the Fifth Circuit Court of Appeals found that the plaintiff distributor's claim of unconscionability of the at-will termination of his distributorship was premised on bad faith or fraudulent conduct prior to the contractual relationship at issue, the court deems that the proper claim for Jones to assert WCI's alleged misconduct is not an unconscionability claim, but instead may be a misrepresentation or breach of fiduciary duty claim, *i.e.*, a claim of breach of duty to disclose. *Walker*, 734 F.2d at 1075–76. Such tort claims are considered below.

### 2. Breach of contract

■ The elements of a breach of contract claim under Ohio law are as follows: (1) the existence of a contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Doner v. Snapp*, 98 Ohio App.3d 597, 649 N.E.2d 42, 44 (1994); *American Sales, Inc. v. Boffo*, 71 Ohio App.3d 168, 593 N.E.2d 316, 321 (1991). The court finds that each of Jones's "breach of contract" claims fails on Jones's inability to generate a genuine issue of material fact as to the first of these elements.

■ Jones's first claim of "breach of contract," alleging breach of the 1987 Agreement, fails to the extent that claim is premised on the unconscionability, and hence unenforceability, of the entire 1993 Agreement. WCI is entitled to summary judgment on that portion of Jones's breach of contract claim, because the 1993 Agreement has not been voided as unconscionable, and by its terms, the 1993 Agreement superseded the 1987 Agreement. 1993 Agreement, p. 8, § VI. Complete Agreement, first paragraph ("This Agreement supersedes and cancels any previous understanding or agreement between the parties relating to the Products covered hereby. It expresses the complete and final understanding of the parties with respect thereto and may not be changed in any way except by an instrument in writing agreed to and signed by both parties."). Thus, Jones cannot generate a genuine issue of material fact as to the continuing existence of the 1987 Agreement. *See Doner*, 649 N.E.2d at 44 (existence of a contract is

one element of a breach of contract claim). However, Jones's "breach of contract" claim has other permutations that the court must investigate further.

■ Jones's "breach of contract" cause of action also asserts that the 1993 Agreement, which pertains specifically to distribution of goods in South Dakota, did not terminate those portions of the 1987 Agreement concerning distribution of goods in Iowa and Nebraska. Consequently, Jones argues, the termination provisions applicable to the Iowa and Nebraska portions of the 1987 Agreement have been breached by WCI's termination of Jones's distributorship. However, the 1993 Agreement provides that it supersedes all previous agreements as to the "products" in question. 1993 Agreement, p. 8, § VI. Complete Agreement, first paragraph ("This Agreement supersedes and cancels any previous understanding or agreement between the parties relating to the Products covered hereby. . . ."). Thus, as a matter of law, the 1993 Agreement superseded the 1987 Agreement in its entirety, whatever the differences in territories identified in the contracts might be, because the 1993 Agreement concerned the same "products" as the 1987 Agreement, and additional ones as well. Therefore, once again, Jones cannot assert a claim of breach of the terms of the 1987 Agreement, because the terms of the 1987 Agreement relied upon were no longer in force. *See Doner*, 649 N.E.2d at 44 (existence of a contract is one element of a breach of contract claim). Furthermore, a dispute of fact over whether or not a WCI representative informed Stewart Hartman of Jones that Jones could still distribute in its old territory, even though Jones's territory was limited to South Dakota by the terms of the 1993 Agreement, does not generate a genuine issue of material fact that precludes summary judgment on Jones's breach of contract claim. *See Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."); *Beyerbach*, 49 F.3d at 1326; *Hartnagel*, 953 F.2d at 394.

■ Finally, this cause of action asserts that WCI breached an agreement arising

from a course of dealing and performance that granted Jones an exclusive sales territory by selling products within this exclusive territory without compensating Jones and by terminating Jones's distributorship agreement and selling in this territory. However, none of the agreements, including the 1993 Agreement, ever granted Jones an exclusive sales territory. Rather, all of them specifically state that Jones's distributorship is "non-exclusive," [10] and the record demonstrates beyond dispute that WCI had sold products directly to dealers within Jones's "Area of Primary Responsibility" during the entire relationship of the parties. Again, Jones has designated no portion of the record that generates a genuine issue of material fact as to whether Jones had a contract right to an "exclusive" sales territory, and has not pressed the issue in its resistance to summary judgment. *See Fed.R.Civ.P.* 56(e) (resisting party must designate "specific facts showing that there is a genuine issue for trial."); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 511 (8th Cir.1995); *Beyerbach,* 49 F.3d at 1325. Thus, Jones cannot establish the existence of an "exclusive" contract. *Doner,* 649 N.E.2d at 44 (existence of a contract is one element of a breach of contract claim). Therefore, this portion of Jones's breach of contract claim also fails.

WCI is entitled to summary judgment on the entirety of Jones's "breach of contract" claim.

### 3. Breach of covenant of good faith and fair dealing

Jones next asserts that WCI violated the covenant of good faith and fair dealing implied into its contract with WCI. As pleaded, the breach of covenant claim is premised on WCI's alleged termination of "override" payments to Jones for sales made directly by WCI to dealers in Jones's territories and

WCI's alleged failure to inform Jones of its plan to terminate Jones and other distributors even while demanding that Jones sign a new distributorship agreement for 1993, which included substantial changes in its termination provisions. As argued by the parties, however, the claim is apparently taken as another attack on WCI's termination without cause of Jones's distributorship. WCI asserts that the implied duty of good faith cannot override express terms of a contract providing for termination without cause. WCI counters that the "without cause" termination clause was "coerced" upon Jones contrary to the duty of good faith.

#### a. The covenant of good faith and fair dealing under Ohio law

The obligation of good faith and fair dealing is implied into every contract under Ohio law by OHIO REV.CODE § 1301.09 (UCC § 1–203), and "good faith" is defined as imposing "honesty in fact in the conduct or transaction concerned." OHIO REV.CODE § 1301.01 (UCC § 1–201(19)). The court must consider whether the allegedly breaching acts were "commercially unjustifiable." *See Master Chem. Corp. v. Inkrott,* 55 Ohio St.3d 23, 563 N.E.2d 26, 31 (1990). The Ohio Supreme Court recently looked to the Seventh Circuit Court of Appeals for guidance on the nature of the implied duty of good faith in every contract:

As the Seventh Circuit Court of Appeals stated in *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting* (C.A.7, 1990), 908 F.2d 1351, 1357–58:

"Firms that have negotiated contracts are entitled to enforce them to the letter, even to the great discomfort of their trading partners, without being mulcted for lack of 'good faith.' Although courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is not an invitation to the court to decide whether one party ought

---

**10.** The 1993 Agreement specifically reserves to WCI the right to make sales to dealers within Jones's Area of Primary Responsibility as follows:

Frigidaire Company reserves the right to sell Products referred to above directly or indirectly, to any Frigidaire Company customer within

Product Distributor's Area of Primary Responsibility and will determine the compensation for services rendered, if any, accruing to the Product Distributor in such case.
1993 Agreement, § I. Products and Distributor's Area of Primary Responsibility, final paragraph.

to have exercised privileges expressly reserved in the document. 'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.

" * * * 'Although Bank's decision left Debtor scratching for other sources of credit, Bank did not create Debtor's need for funds, and it was not contractually obliged to satisfy its customer's desires. The Bank was entitled to advance its own interests, and it did not need to put the interest of Debtor * * * first....' "

*Ed Schory & Sons, Inc. v. Society Nat'l Bank,* 75 Ohio St.3d 433, 662 N.E.2d 1074, 1083 (1996); *see also Salem v. Central Trust Co., N.A.,* 102 Ohio App.3d 672, 657 N.E.2d 827, 832 (1995) (also quoting the above from *Kham & Nate's Shoes* and citing *Bennco Liquidating Co. v. Ameritrust Co. Nat'l Ass'n,* 86 Ohio App.3d 646, 621 N.E.2d 760, 762 (1993)). Thus, where the allegedly breaching party fulfilled its contractual obligations, then stood on its right to require payment from the other party, there was no breach of an implied duty of good faith, and the trial court properly dismissed such a claim. *Id.* Similarly, where the defendant acted pursuant to a contract right, it did not breach its duty to act in good faith. *Salem,* 657 N.E.2d at 831. Numerous courts have held that the duty of good faith cannot override or modify explicit contractual terms. *See, e.g., McDonald's Corp. v. Watson,* 69 F.3d 36, 43 (5th Cir.1995) (finding, under Illinois law, that "a party cannot be guilty of bad faith and unfair dealings when acting in compliance with terms of a contractual agreement," citing *Hubbard Chevrolet Co. v. General Motors Corp.,* 873 F.2d 873, 878 (5th Cir.), *cert. denied,* 493 U.S. 978, 110 S.Ct. 506, 107 L.Ed.2d 508 (1989), and *Corenswet, Inc.,* 594 F.2d at 138, and noting that *Corenswet* refused to extend the duty of good faith and fair dealing to the at-will termination clause of a distributorship contract, because Iowa law appeared to be silent on the applicability of such an implied covenant to distributorship agreements); *Petereit v. S.B.*

*Thomas, Inc.,* 63 F.3d 1169, 1184–85 (2d Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1351, 134 L.Ed.2d 520 (1996) (citing cases holding that no duty of good faith is violated when a manufacturer exercises rights to terminate a distributor or franchisee without cause); *Riggs Nat'l Bank of Washington, D.C. v. Linch,* 36 F.3d 370, 373 (4th Cir.1994) ("the duty of good faith cannot override or modify explicit contractual terms.").

### b. Jones's allegations of breach of good faith

■ Because the termination of "overrides" alleged as Jones's first basis for the violation of WCI's duty of good faith was coincident with WCI's termination of Jones's distributorship, and that termination without cause was specifically provided for under the terms of the 1993 Agreement, Jones has failed to generate a genuine issue of material fact as to any violation of good faith as to termination of override payments. Similarly, the termination itself was authorized by the terms of the contract, and therefore cannot form the basis of a claim of breach of duty of good faith.

■ Jones's claim of breach of good faith as to failure to inform Jones of an intention to terminate distributorships and claim of "coercion" in the signing of the 1993 Agreement are, this court finds, more properly presented in Jones's claims of fraudulent misrepresentation and fraudulent non-disclosure in the inducement to enter the 1993 Agreement, than they are by any claim of breach of good faith. *See Walker,* 734 F.2d at 1075–76 (finding that claims of unconscionability in a breach of "good faith" or fiduciary duty resulting from enforcement of an at-will termination clause in a distributorship agreement was properly formulated as a claim of fraud in the inducement where the alleged bad faith was in the inducement to the contract); *Corenswet,* 594 F.2d at 138 ("As a tool for policing distributorship terminations, ... the good faith test is erratic at best."). These tort causes of action consider whether WCI improperly failed to inform Jones of its plan to terminate Jones and other distributors even while demanding that Jones sign a new distributorship agreement

for 1993 including substantial changes in the termination provisions of the contract, and whether WCI breached a duty of "good faith" by making false representations to induce Jones to enter the contract.[11] Summary judgment will therefore be granted in WCI's favor on Jones's claim of breach of the implied covenant of good faith.

## D. Tort Claims

Jones makes three tort claims against WCI. They are claims of tortious interference with business relationships, fraudulent misrepresentation, and fraudulent non-disclosure. The parties agree that Iowa law applies to these tort claims in this diversity action, and the court concurs. Therefore, the court turns to consideration of each of these tort claims under Iowa law.

### 1. Tortious interference with business relationships

Jones's claim of tortious interference with business relationships is premised on WCI's direct dealings with and sales to Jones's customers after Jones's distributorship was terminated. Jones therefore asserts that WCI has interfered with the contractual or business relationships between Jones and its customers. WCI asserts that it is entitled to summary judgment on this claim, because Jones has not alleged any prospective contract or business relationship with a third party with which WCI interfered. Further-

more, WCI asserts, the 1993 Agreement and its predecessors all permitted WCI to make direct sales to dealers and other customers in Jones's "Area of Primary Responsibility"; thus, WCI was exercising a reserved contract right and cannot thereby be found to have acted tortiously. Jones contends that it has shown or generated a genuine issue of material fact as to every element of this tort claim, because it has asserted numerous business relationships with dealers in South Dakota, Iowa, and Nebraska, which WCI interfered with by terminating Jones's distributorship, WCI knew of those relationships, and whether WCI intentionally and improperly interfered with those relationships is a question of fact for the jury. Jones continues to assert that WCI did not have a contract right to terminate its distributorship, and thereby interfere with Jones's relationship with its customers.

### a. Tortious interference under Iowa law

This court recently considered the elements under Iowa law of tortious interference with business advantages or relations in *Fink v. Kitzman*, 881 F.Supp. 1347, 1382–83 (N.D.Iowa 1995). Unlike tortious interference with a contract,[12] the tort of interference with business relations or advantages does not require a showing that a contract existed between the plaintiff and another. *Toney v. Casey's General Stores,*

11. The court cannot find that a genuine issue of material fact as to "coercion" has been generated where WCI allowed Jones three months to peruse the new contract, and only then demanded that Jones either sign the contract or be cut off from further supplies.

12. The court also considered the elements of tortious interference with a contract in *Fink*, 881 F.Supp. at 1382. Such a claim under Iowa law is based on the Restatement (Second) of Torts § 766 (1977):

One [Kitzman] who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another [Fink] and a third person [Grundy County] by inducing or otherwise causing the third person [Grundy County] not to perform the contract, is subject to liability to the other [Fink] for pecuniary loss resulting to the other [Fink] from the failure of the third person [Grundy County] to perform the contract.

*Grahek v. Voluntary Hosp. Co-op.*, 473 N.W.2d 31, 35 (Iowa 1991); *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985); Iowa Civil Jury Instruction 1200.1. Thus, the plaintiff must show (1) the plaintiff had a valid contract, (2) the defendant knew of the contract, (3) the defendant intentionally and improperly interfered with the contract, (4) the interference caused the contracting parties not to perform the contract with the plaintiff, and (5) the amount of the plaintiff's damages. *Water Dev. Co. v. Board of Water Works*, 488 N.W.2d 158, 161 (Iowa 1992) (citing *Nesler v. Fisher & Co., Inc.*, 452 N.W.2d 191, 194 (Iowa 1990)); *See also* Iowa Civil Jury Instruction 1200.1.

This tort is not committed by parties to the contract; the tortfeasor must interfere with a contract between another and a third person. *Grahek, supra,* at 35. The tort plainly requires that a third party, who is a party to the underlying contract, be induced or caused to act by the alleged tortfeasor, who must be a stranger to the contract. *Id.*

*Inc.,* 372 N.W.2d 220, 222 (Iowa 1985); *Clark v. Figge,* 181 N.W.2d 211, 213 (Iowa 1970).[13] However, this tort is also premised on the acts of a stranger to the relationship in interfering with relations between the plaintiff and another, as is shown by the elements of the tort:

 1. The plaintiff had a prospective [contract or business relationship] with a [third person].

 2. The defendant knew of the prospective relationship.

 3. The defendant intentionally and improperly interfered with the relationship by [set forth the particulars supported by the evidence].

 4. a. The interference caused [the third person] not [to enter into or continue] the relationship [or]

 b. The interference prevented the plaintiff from [entering or continuing] the relationship.

 5. The amount of damage.

Iowa Civil Jury Instructions, 1200.2; *see generally, Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Gordon v. Noel,* 356 N.W.2d 559, 563 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984).

### b. *Jones's claim of tortious interference*

■ What is fatal to Jones's claim here, is Jones's inability to generate a genuine issue of material fact that WCI's "interference" with Jones's customers was "improper." Iowa Civil Jury Instructions, 1200.2 (element three). First, the court has found above that Jones's termination was not pursuant to an unconscionable contract clause. However, at least as important is the fact that it is undisputed that the 1993 Agreement and the prior agreements all provided that WCI could make such contacts with Jones's customers even had the contracts still been in force. Furthermore, the course of dealing of the parties demonstrates beyond dispute that WCI had made such contacts with customers in Jones's "Area of Primary Responsibility" pursuant to the reserved right in the contract. Summary judgment will therefore be granted in WCI's favor on Jones's claim of tortious interference with business relationships.

### 2. *Fraudulent misrepresentation*

Jones's cause of action for "Fraud, Misrepresentation, Coercion and Duress" is a claim of fraudulent misrepresentation premised on WCI's alleged repeated assurances that Jones would always be able to sell Frigidaire products, contrary to WCI's actual termination of its distributorship agreement with Jones.[14] WCI asserts that Jones cannot meet the first element of such a claim, because it cannot show that there was any "representation about the past or present,"

---

**13.** A more essential distinction, in most cases, between this tort and the tort of interference with contractual relations is that for the tort of interference with business relations or advantages, the tortfeasor must be shown to have had as a purpose for the interference "to financially injure or destroy the plaintiff" while no such showing of intent is necessary for the tort of interference with a contract. *Burke v. Hawkeye Nat'l Life Ins. Co.,* 474 N.W.2d 110, 114 (Iowa 1991); *Nesler v. Fisher & Co., Inc.,* 452 N.W.2d 191, 199 (Iowa 1990); *Page County Appliance Ctr., Inc. v. Honeywell, Inc.,* 347 N.W.2d 171, 177 (Iowa 1984); *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 799 (Iowa 1984); *First Medical, Inc. v. Embassy Manor Care Ctr., Inc.,* 483 N.W.2d 14, 16 (Iowa App.1992).

**14.** This is Jones's fraudulent misrepresentation claim as pleaded. In its brief in resistance to WCI's motion for summary judgment, Jones contends that the representations at issue concerned WCI's concealment of changes in the 1993 Agreement's termination provisions and concealment of WCI's plans to terminate all distributors. However, these alleged concealments properly pertain to Jones's claim of fraudulent non-disclosure. In its brief and again at the oral arguments, Jones also asserted that another material false misrepresentation upon which this claim is premised was the statement in the cover letter from Caroll Woods that the 1993 Agreement was to "update" WCI's files, when it was really intended to pave the way to terminate Jones by adding a "without cause" termination provision. Thus, the court will concern itself here only with the alleged misrepresentations as pleaded, that is, alleged assurances that Jones would always be able to sell WCI products, and the alleged misrepresentation concerning updating of files in the cover letter to the 1993 Agreement. As to the assurances that Jones would always be able to sell WCI products, counsel for Jones clarified at oral arguments that the assurances also took the form of assuring Jones that WCI would always need distributors like Jones in rural areas.

citing for this statement of Iowa law *OKI Distrib., Inc. v. Amana Refrigeration, Inc.,* 850 F.Supp. 637, 645 (S.D.Ohio 1994).

### a. Fraudulent misrepresentation under Iowa law

 In light of WCI's specific argument concerning the first element of a claim of fraudulent misrepresentation under Iowa law, the court must first settle what are the proper elements of such a claim. Although the court deciding *OKI Distrib.* did indeed state the elements of a claim of fraudulent misrepresentation under Iowa law as WCI has asserted, neither of the cases upon which it relies can properly be shown to stand for that proposition.[15]

Instead, the elements of fraudulent misrepresentation under Iowa law, as this court recently observed in *Utica Mut. Ins. Co. v. Stockdale Agency,* 892 F.Supp. 1179, 1192–93 (N.D.Iowa 1995), are as follows: "(1) a material (2) false (3) representation coupled with (4) scienter and (5) intent to deceive, which the other party (6) relies upon with (7) resulting damages to the relying party." *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 260 (Iowa 1991) (citing *Sinnard v. Roach,* 414 N.W.2d 100, 105 (Iowa 1987), which in turn cites *Hall v. Wright,* 261 Iowa 758, 766, 156 N.W.2d 661, 666 (1968), and also citing *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981)); *Air Host Cedar Rapids v. Cedar Rapids Airport Comm'n,* 464 N.W.2d 450, 453 (Iowa 1990) (telescoping the first three elements

and stating the "intent" element differently, hence: "(1) a material misrepresentation; (2) made knowingly; (3) with intent to induce the plaintiff to act or refrain from acting; (4) upon which the plaintiff justifiably relies; and (5) damages," citing *Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1237 (8th Cir. 1987), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988)); *Sinnard,* 414 N.W.2d at 105; *Robinson,* 412 N.W.2d at 565 (listing the elements in slightly different order as "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent to deceive; (6) reliance; and (7) resulting injury and damage," citing *Cornell*); *Cornell v. Wunschel,* 408 N.W.2d 369, 374 (Iowa 1987) (listing same elements, citing *B & B Asphalt Co. v. T.S. McShane Co.,* 242 N.W.2d 279, 284 (Iowa 1976)); *Kristerin Dev. Co. v. Granson Inv.,* 394 N.W.2d 325, 332 (Iowa 1986) (listing the elements as in *Air Host Cedar Rapids,* citing *Beeck v. Aquaslide 'N' Dive Corp.,* 350 N.W.2d 149, 155 (Iowa 1984)); *Beeck,* 350 N.W.2d at 155 (listing elements as in *Kristerin,* and quoting a prior decision in a related case, *Beeck v. Kapalis,* 302 N.W.2d 90, 94 (Iowa 1981)); *Citizens Sav. Bank v. Wild,* 512 N.W.2d 799, 801–02 (Iowa Ct.App.1993) (citing *Irons*); *see also Ryko Mfg. Co. v. Eden Servs.,* 823 F.2d 1215, 1237 (8th Cir.1987) (applying Iowa law and stating the factors as quoted in *Air Host Cedar Rapids*), *cert. denied,* 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).

---

**15.** The court in *OKI Distrib.* stated,

> Under Iowa law, fraud consists of 1) a representation about the past or present; 2) falsity; 3) materiality; 4) scienter; 5) intent to deceive; 6) reasonable reliance on the promise; and 7) resulting damage. *Robinson v. Perpetual Services Corp.,* 412 N.W.2d 562, 565 (Iowa Sup. Ct.1987); *Irons v. Community State Bank,* 461 N.W.2d 849, 853 (Iowa Ct.App.1990). Although fraud may also arise from a failure to disclose material facts (providing that the other elements are present) the party failing to disclose the information must have a legal duty to do so. *Irons,* 461 N.W.2d at 854.

*OKI Distrib.,* 850 F.Supp. at 645–46. However, in *Robinson,* the Iowa Supreme Court actually stated the elements of fraud as follows: "(1) representation, (2) falsity, (3) materiality, (4) scienter, (5) intent to deceive, (6) reliance, and (7) resulting injury and damage." *Robinson,* 412 N.W.2d at 565. Furthermore, the court observed

that "[u]nder Iowa law, a statement of intent to perform a future act is actionable if when made the speaker had an existing intention not to perform." *Id.* (citing *Hagarty v. Dysart–Geneseo Community Sch. Dist.,* 282 N.W.2d 92, 95 (Iowa 1979), and *Grefe v. Ross,* 231 N.W.2d 863, 867 (Iowa 1975)). Nor can *Irons* be read as interpreted by the court in *OKI Distrib. See Irons,* 461 N.W.2d at 853 (listing the elements as quoted from *Robinson,* and that decision's assertion that a statement of intent to perform a future act is actionable if the speaker had an existing intention not to perform, and quoting further from the Prosser, *The Law of Torts,* § 109, pp. 730–31 (4th ed.1971), the statement that "[u]nless the present state of mind is misstated, there is no misrepresentation. When a promise is made in good faith, with the expectation of carrying it out, the fact that it is subsequently broken gives rise to no cause of action, either for deceit, or equitable relief.").

Still more recently than this court's decision in *Utica Mut. Ins.*, the Iowa Supreme Court has reiterated that the elements of fraudulent misrepresentation, or "fraudulent inducement" to contract, are "(1) representation; (2) falsity; (3) materiality; (4) scienter; (5) intent; (6) justifiable reliance; and (7) resulting injury or damage." *Hyler v. Garner*, 548 N.W.2d 864, 871 (Iowa 1996) (citing *McGough v. Gabus*, 526 N.W.2d 328, 331 (Iowa 1995)).[16] There is no requirement that the representation concern the past or present; indeed, Iowa decisions make clear that representations about the future may be actionable where there was no intent at the time the representation was made to fulfill such a representation. *See, e.g., Robinson*, 412 N.W.2d at 565. Thus, WCI is not entitled to summary judgment on Jones's fraudulent misrepresentation claim on the ground that it cannot meet the first element of its claim as improperly formulated by the court in *OKI Distrib.*

### b. The effect of an integration clause under Iowa law

WCI next asserts that the alleged misrepresentation, a purported statement that Jones would always be able to sell WCI products, fails as a matter of law, because the 1993 Agreement contains an integration clause that specifically cancels any alleged previous agreements, again citing for support *OKI Distrib.*, 850 F.Supp. at 646. The effect of integration clauses on claims of fraudulent inducement has not altogether escaped the Iowa Supreme Court, either, once again making WCI's reliance on an out-of-state interpretation of Iowa law suspect. Most recently, in *Whalen v. Connelly*, 545 N.W.2d 284 (Iowa 1996), the court observed:

> Whalen cannot establish these elements [of fraudulent inducement] for two reasons. In the first place all of the alleged

representations involved matters that were specifically addressed in the integrated written partnership agreements and corresponding letter agreements. Although we have allowed fraudulent inducement claims to proceed despite an integration clause in a contract, we have done so only with regard to misrepresentations concerning facts or circumstances not included in the written contract. *See Robinson*, 412 N.W.2d at 567 (fine print, boiler plate provision not intended to encompass assurances made to persuade signing of the contract); *Hall v. Crow*, 240 Iowa 81, 87–88, 34 N.W.2d 195, 199 (1948). Such is not the case here.

*Whalen*, 545 N.W.2d at 284.[17] The matters specifically addressed in the "integrated" contract in *Whalen* that were purportedly contrary to representations were the extent of a partner's management control of the partnership. *Id.*

In *Robinson*, to which the Iowa Supreme Court referred in *Whalen*, the court found that the assurances were not the subject of provisions of the written contract. *Robinson*, 412 N.W.2d at 566–67. The assurances in question in that case were that the plaintiffs would be granted an "exclusivity" provision in a franchise agreement. *Id.* at 566. The defendant responded to the request for such a provision by refusing to include it in the contract, asserting such a provision was "illegal." *Id.* However, the defendant repeatedly assured the plaintiffs that while it could not legally ensure exclusivity, it nevertheless would solicit no other franchises in the area once plaintiffs' agreement was in place. *Id.* The court found that "[t]hese assurances were presented as established company policy and unquestionably were intended to induce plaintiffs to enter into an agreement with Iowa–Nebraska. Plaintiffs testified that without such assurances no

---

16. In *Hyler*, the Iowa Supreme Court noted with approval this court's decision in *Utica Mut. Ins.* in which this court pointed out that the Iowa Supreme Court had defined the "intent" element of a claim based on misrepresentation in two different ways. *Hyler*, 548 N.W.2d at 871. The Iowa Supreme Court then adopted this court's formulation of the "intent" element in an equity action for rescission based on misrepresentation,

as well as this court's rationale for that formulation. *Id.* at 871–72.

17. The second reason the plaintiff could not assert fraud in the inducement in *Whalen*, disaffirmance of the fraudulent inducement claim by entering into a second contract after airing the plaintiff's fraud concerns, is not present in this case. *Cf. Whalen*, 545 N.W.2d at 294.

agreement would have been reached." *Id.* The court found that a jury question was properly presented on fraud in the inducement despite an integration clause that stated, "[T]here are no representations, inducements, promises or agreements, oral or otherwise, between the parties not embodied herein, which are of any force or effect with reference to this Agreement or otherwise." *Id.* at 567. The court wrote:

> The jury may well have considered this fine-print, boiler-plate [integration] provision was not intended to encompass the assurances [the defendant] was making to the plaintiffs to persuade them to sign the instrument. Nor are such provisions legally enforceable when there has been fraud that has induced the making of the contract. *Hall v. Crow,* 240 Iowa 81, 88, 34 N.W.2d 195, 199 (1948) ("[W]here there is evidence of fraudulent misrepresentation in the inception of a contract such misrepresentations can be the basis for ... an action ... for damages, despite the limiting provisions of a contract."); *see International Milling Co. v. Gisch,* 258 Iowa 63, 71, 137 N.W.2d 625, 630 (1965).

*Robinson,* 412 N.W.2d at 567. The court concludes that a jury question has also been raised in this case as to whether the integration clause was intended to encompass the assurances that Jones would always be able to sell WCI products, which may have been made to induce Jones to continue its contractual relationship as long as it suited WCI, but under the terms that suited WCI should WCI decide to terminate its distributors once its direct sales operation was ready. Assurances that a distributor will always have a relationship with a manufacturer would seem to go to the inception of a contract between them, and therefore can be the basis for an action for damages notwithstanding the limitations found in an integration clause. *Robinson,* 412 N.W.2d at 567; *Hall,* 240 Iowa at 88, 34 N.W.2d at 199. The court does not believe that the assurances were necessarily any less of an inducement to Jones to sign the 1993 Agreement simply because they were purportedly made in 1991, when the parties had already enjoyed a long-term relationship. Unlike the matters at issue in *Whalen,* which had been the subject of specific provisions of the contract, the assurances of a continuing relationship are not specifically undermined by provisions of a contract providing for termination for cause, or even by provisions providing for termination without cause, where the contract does not otherwise provide for a specific duration. *Cf. Whalen,* 545 N.W.2d at 294 (extent of management control exercised by a party was specifically addressed in the integrated contract). WCI is not entitled to summary judgment on Jones's fraudulent misrepresentation claim on this ground, either.

### c. Misrepresentations in the cover letter

■ Jones also asserted, in its brief and at oral arguments, that another material false misrepresentation was in the cover letter to the 1993 Agreement sent by Caroll Woods in which Mr. Woods states that the 1993 Agreement is to "update" WCI's files. Jones contends that the material falsity of this representation is that WCI did not offer the new contract just to "update files," but to pave the way to terminate Jones's distributorship, recognizing that the 1987 Agreement only permitted termination for cause. Jones points to evidence in the record in notes of the WCI task force on distributors in which references are made to the need to terminate old contracts with for-cause provisions prior to the announcement of the termination of all distributors. Although it is a somewhat tenuous inference, there is a genuine issue of material fact that the reason WCI gave for a need to enter into a new contract with Jones was false and that a mere updating of files would be intended to induce Jones to agree to the new contract without a fuss when substantive changes were actually WCI's motivation.

### d. Reliance

■ WCI's final challenge to the adequacy of the fraudulent misrepresentation claim is that the record reflects no reliance by Jones on any of the purportedly material false representations in deciding to sign the 1993 Agreement. WCI contends there could be no reliance on assurances that Jones would always be able to sell for WCI or that

WCI would always need rural distributors, when it was apparent to Jones that distributors were being terminated by other manufacturers, WCI had terminated distributors, and the contracts under which Jones was operating were either for specified durations or provided certain grounds for termination. WCI also contends that the extent of Jones's argument for reliance on the cover letter's reference to updating of files was to decide not to read the contract before signing it.

Although they are again tenuous, there are sufficient inferences from the record to establish the reliance element of Jones's fraudulent misrepresentation claim. First, the context of the assurances of long-term relationship was specifically that Jones was seeking such assurances in light of the termination of some distributors by WCI and other manufacturers. Thus, it might have been reasonable for Jones to rely on assurances it sought to allay the very fears WCI says Jones should have had. Furthermore, as to the reference to updating of files, Jones has presented evidence that the cover letter to the 1987 Agreement identified changes with some specificity; thus, it was reasonable for Jones to rely on the absence of such specific indications of changes in the 1993 Agreement. Although the court is of the opinion that it may be very difficult for Jones to show that it was reasonable for Hartman to rely on any of these representations to decide not to read the 1993 Agreement to discover its terms for himself, it is the possible reasonable inferences, not the court's opinion of the strength of those inferences, that is decisive on summary judgment. *Johnson,* 906 F.2d at 1237 (the trial judge's function at summary judgment is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial). Although it is with reservations, the court will deny summary judgment on Jones's claim of fraudulent misrepresentation.[18]

---

**18.** The court's reservations are deepened by the fact that fraudulent misrepresentation under Iowa law must ultimately be proved by clear and convincing evidence. *See, e.g., Clark v. McDaniel,* 546 N.W.2d 590, 592 (Iowa 1996) (reiterating this standard of proof for fraud claims under Iowa law); *McGough,* 526 N.W.2d at 331 (same, citing *Beeck v. Aquaslide 'N' Dive Corp.,* 350

### 3. *Fraudulent non-disclosure*

Jones's claim of fraudulent non-disclosure is founded principally on WCI's failure to disclose the changes in the 1993 Agreement in the accompanying cover letter. Jones alleges that WCI proffered this new contract without disclosure of the pertinent termination terms although it had known as far back as 1991 that it intended to terminate distributor contracts across the country and had established a task force to discuss and prepare for the contemplated terminations. Jones alleges that "special circumstances" existed between Jones and WCI that gave rise to WCI's duty to disclose the contemplated terminations of distributors. These "special circumstances" include the long-term relationship of the parties and the trust that had developed over numerous years and a prior course of dealing. Jones alleges that the information WCI failed to disclose was material to its signing of the 1993 Agreement, and that Jones relied to its detriment on a continuing relationship when it signed the 1993 Agreement without being advised of or noticing the change in the termination provisions. Hence, in its brief in resistance to WCI's motion for summary judgment, Jones also contends that WCI improperly concealed changes in the 1993 Agreement's termination provisions.[19]

WCI, asserting that the elements of this claim are identical to those for fraudulent misrepresentation, again citing *OKI Distrib.,* contends that there is no representation about the past or present upon which to found the claim. It also contends that a claim that the cover letter did not note the changes was a material non-disclosure is absurd on its face, because the 1993 Agreement simply streamlined the process to terminate the distributorship under a no-cause termination clause, while the 1987 Agreement provided that the 1987 Agreement could be ter-

---

N.W.2d 149, 155 (Iowa 1984)); *Lockard v. Carson,* 287 N.W.2d 871, 873–74 (Iowa 1980).

**19.** The court has indicated that it will consider this allegation, actually raised in reference to the "misrepresentation" claim in the context of the "non-disclosure" claim. *See supra,* n. 14.

minated by the proffer of a superseding agreement.[20] WCI also argues that Jones cannot establish any duty on its part to disclose its plans to terminate distributorships, because one business is under no duty to disclose the innermost secrets of its strategic planning to another business.

### a. Fraudulent non-disclosure under Iowa law

Iowa law recognizes that "[a] representation need not be an affirmative misstatement; the concealment of or failure to disclose a material fact can constitute fraud." *Clark v. McDaniel,* 546 N.W.2d 590, 592 (Iowa 1996) (citing *Sinnard,* 414 N.W.2d at 105, and *Cornell,* 408 N.W.2d at 374). However, as the Iowa Supreme Court has observed,

> for concealment to be actionable, the representation must "relate to a material matter known to the party ... which it is his legal duty to communicate to the other contracting party whether the duty arises from a relation of trust, from confidence, from inequality of condition and knowledge, or other attendant circumstances." *Sinnard,* 414 N.W.2d at 105 (quoting *Wilden Clinic, Inc. v. City of Des Moines,* 229 N.W.2d 286, 293 (Iowa 1975)).

*Clark,* 546 N.W.2d at 592; *McGough,* 526 N.W.2d at 331 (fraud may arise from a special relationship giving rise to a duty to disclose and failure to make that disclosure). Hence, the Iowa Civil Jury Instructions formulate the elements of a claim of fraudulent concealment somewhat differently from the elements of fraudulent misrepresentation:

1. Special circumstances existed which gave rise to a duty of disclosure between the plaintiff and the defendant. *(Describe the relationship found to give rise to a duty of disclosure.)*

2. While such relationship existed, the defendant [was aware of the following facts] [intended the following course of action] *(state the facts or intent alleged to have been withheld ).*

3. While such relationship existed, the defendant concealed or failed to disclose [the knowledge or intent alleged to have been withheld].

4. The undisclosed information was material to the transaction.

5. The defendant knowingly failed to make the disclosure.

6. The defendant intended to deceive the plaintiff by withholding such information.

7. The plaintiff acted in reliance upon the defendant's failure to disclose and was justified in such reliance.

8. The failure to disclose was a proximate cause of the plaintiff's damage.

9. The nature and extent of the plaintiff's damage.

Iowa Civil Jury Instructions, 810.2 (citing *Air Host Cedar Rapids, Inc.,* 464 N.W.2d at 450; *Sinnard,* 414 N.W.2d at 100; *Cornell,* 408 N.W.2d at 369; *Kunkle Water & Elec. Inc. v. City of Prescott,* 347 N.W.2d 648 (Iowa 1984); Restatement (Second) of Torts § 551; and *American Family Serv. Corp. v. Michelfelder,* 968 F.2d 667 (8th Cir.1992)).

### b. WCI's duty to disclose

WCI's principal ground for summary judgment on this fraudulent non-disclosure claim, although WCI formulates the challenge in terms of lack of "scienter," is that WCI had no duty to disclose its plans concerning distributorships to Jones. WCI again cites *OKI Distrib.* as holding that a manufacturer does not have a duty to disclose to a distributor its plans to make a structural change in the way the company operates, which involved doing away with its distributorship program, because "[a] manufacturer does not have a duty to insulate distributors from all economic hardship at its own expense." *OKI Distrib.,* 850 F.Supp. at 646. WCI also cites *Cloverdale Equip. Co. v. Simon Aerials, Inc., 869* F.2d 934, 941 (6th Cir.1989), as in accord with this proposition.

The Comment to Iowa Civil Jury Instruction 810.2 states,

---

**20.** At oral arguments, Jones asserted that the superseding agreement had to contain terms at least as favorable to Jones as the superseded agreement. There is no such contractual requirement, and Jones has cited no authority in support of this strange notion.

> *Whether the special circumstances are such as to give rise to a duty of disclosure is generally a question of law for the Court. Restatement (Second) of Torts Section 551, Comment m (1977). Whether such special circumstances exist is a question of fact for the jury.*

Iowa Civil Jury Instructions, 810.2, Comment (italics and underlining as in the original). The comment from the Restatement (Second) of Torts § 551 identified states as follows:

> *m. Court and jury.* Whether there is a duty to the other to disclose the fact in question is always a matter for the determination of the court. If there are disputed facts bearing upon the existence of the duty, as for example the defendant's knowledge of the fact, the other's ignorance of it or his opportunity to ascertain it, the customs of the particular trade, or the defendant's knowledge that the plaintiff reasonably expects him to make the disclosure, they are to be determined by the jury under appropriate instructions as to the existence of the duty.

Restatement (Second) of Torts § 551, comment *m*. Thus, the court must decide in the first instance whether the circumstances asserted, if proved, would be sufficient to give rise to a duty to disclose; if the court finds the circumstances alleged would be sufficient, the jury will then be presented with the factual question of whether those circumstances indeed existed, provided of course, at the summary judgment stage of the proceedings, the plaintiff can generate a genuine issue of material fact as to the existence of those circumstances.

### c. When does the duty arise?

**i. One stated test.** The Iowa Supreme Court has stated that

> [t]here is no specific test for determining when a duty to reveal arises in fraud cases. *Sinnard*, 414 N.W.2d at 106. However, we have stated that
>
> > [a] misrepresentation may occur when one with superior knowledge, dealing with inexperienced persons who rely on him or her, purposely suppresses the truth respecting a material fact involved in the transaction.
>
> *Kunkle Water & Elec., Inc. v. City of Prescott,* 347 N.W.2d 648, 653 (Iowa 1984); *see also Sinnard,* 414 N.W.2d at 106 (applying the *Kunkle* analysis).

*Clark,* 546 N.W.2d at 592. Jones plainly cannot meet this particular test, because, even assuming WCI had "superior knowledge," Jones's Hartman was not an "inexperienced person" in matters of distributor contracts, however much Hartman may have relied on WCI to disclose information Jones considered material. *See also Cornell,* 408 N.W.2d at 376 (basing defendant's duty to disclose on his "superior knowledge" where the defendant "had special knowledge of the facts relevant to" the business in question and he "also had more experience in owning and operating this type of multipurpose facility than did [the plaintiffs]").

**ii. Other general tests.** The Iowa Court of Appeals has stated that a legal duty to communicate information to another " 'can arise from a relation of trust, a relation of confidence, inequality of condition and knowledge, or other circumstances shown by a particular fact situation.' " *Anderson v. Boeke,* 491 N.W.2d 182, 188 (Iowa Ct.App. 1992) (quoting *Irons v. Community State Bank,* 461 N.W.2d 849, 854 (Iowa Ct.App. 1990)). The Iowa Court of Appeals has also observed that "Iowa courts place weight upon the Restatement (Second) of Torts when determining whether a duty is owed and, if so, what the extent of that duty is." *Lindaman v. Bode,* 478 N.W.2d 312, 314 (Iowa Ct.App.1991) (citing *Shaw v. Soo Line R. Co.,* 463 N.W.2d 51, 55 (Iowa 1990)). Thus, in a negligent non-disclosure case, the Iowa Court of Appeals noted that Restatement (Second) of Torts § 314A provides that the existence of a special relationship may give rise to a duty on the part of one to aid or protect the other. *Id.* However, the "special relationships" identified in that section of the Restatement (Second) of Torts are inapplicable here. Restatement (Second) of Torts § 314A (defining "special relations" that include common carriers, innkeepers, possessors of land, and persons who voluntarily or by law take custody of another).

*iii. Tests in Restatement (Second) of Torts § 551.* More directly on point for the definition of a special relationship in this case are Restatement (Second) of Torts § 551, which specifically deals with liability for nondisclosure, and the comments thereto. That section of the Restatement provides as follows:

> § 551. Liability for Nondisclosure
>
> (1) One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting in a business transaction is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question
>
> (2) One party to a business transaction is under a duty to exercise reasonable care to disclose to the other before the transaction is consummated,.
>
> (a) matters known to him that the other is entitled to know because of a fiduciary or other similar relation of trust and confidence between them; and
>
> (b) matters known to him that he knows to be necessary to prevent his partial or ambiguous statement of the facts from being misleading; and
>
> (c) subsequently acquired information that he knows will make untrue or misleading a previous representation that when made was true or believed to be so; and
>
> (d) the falsity of a representation not made with the expectation that it would be acted upon, if he subsequently learns that the other is about to act in reliance upon it in a transaction with him; and
>
> (e) facts basic to the transaction, if he knows that the other is about to enter into it under a mistake as to them, and that the other, because of the relationship between them, the customs of the trade or other objective circumstances, would reasonably expect a disclosure of those facts.

Restatement (Second) of Torts § 551. The court finds that Jones has asserted circumstances that fall within several of these iden- tifications of when a duty of disclosure arises in a business relationship.

■ First, Jones asserts that there was at least a relationship of trust or confidence between WCI and Jones, as identified in Restatement (Second) of Torts § 551(2)(a). As to the special relationships referred to in subsection (a), the comments identify the duty of a trustee to a beneficiary, the duty of an agent to a principal, and further state,

> Other relations of trust and confidence include those of the executor of an estate and its beneficiary, a bank and an investing depositor, and those of physician and patient, attorney and client, priest and parishioner, partners, tenants in common and guardian and ward. Members of the same family normally stand in a fiduciary relation to one another.... In addition, certain types of contracts such as those of suretyship or guaranty, insurance and joint adventure, are recognized as creating in themselves a confidential relation and hence as requiring the utmost good faith and full and fair disclosure of all material facts.

Restatement (Second) of Torts § 551, comments *e & f; see also Peoples Bank & Trust Co. v. Lala,* 392 N.W.2d 179 (Iowa Ct.App. 1986) (relying on comment *f* as identifying persons with a duty to disclose in a case involving a bank and an individual who had executed a note and mortgage on her homestead). The contractual relationship of WCI and Jones is not specifically listed in the comment. Therefore, the question is whether Jones can establish a "similar relation of trust and confidence" between the parties. However, before deciding whether Jones has alleged such a relationship, which, if proved, would give rise to the duty to disclose, the court will briefly consider another basis for WCI's duty apparent from Jones's allegations.

Jones may be able to establish WCI's duty to disclose its plans to terminate distributorships pursuant to Restatement (Second) of Torts § 551(2)(e), which pertains to "facts basic to the transaction." Comment *j* states, in pertinent part, the following:

A basic fact is a fact that is assumed by the parties as a basis for the transaction itself. It is a fact that goes to the basis, or essence, of the transaction, and is an important part of the substance of what is bargained for or dealt with. Other facts may serve as important and persuasive inducements to enter into the transaction, but not go to its essence. These facts may be material, but they are not basic. If the parties expressly or impliedly place the risk as to the existence of a fact on one party or if the law places it there by custom or otherwise the other party has no duty of disclosure.

Here, Jones has put forward evidence that a basic fact of its relationship with WCI, founded on assurances from WCI purportedly made in 1991 and the open duration of the 1987 Agreement, was that it would continue to have a long-term relationship with WCI. Thus, evidence that WCI in fact intended to terminate all distributorships in the near future is also "basic," or goes to the essence, of Jones's 1993 transaction with WCI in the form of signing a new contract. WCI can hardly assert that these facts were "patent" or that Jones had an "equal opportunity for obtaining" that information, unless WCI can contradict the evidence Jones has submitted indicating that WCI strove to keep confidential any plans concerning its termination of distributorships. *See* Restatement (Second) of Torts § 551, comment *k* ("When the facts are patent, or when the plaintiff has equal opportunity for obtaining information that he may be expected to utilize if he cares to do so," the defendant has no duty to disclose the facts). However, this basis of a duty to disclose also depends upon "the relationship between [the parties,] the customs of the trade or other objective circumstances," Restatement (Second) of Torts § 551(2)(e), so that, standing alone, the existence of the basic fact that WCI intended to terminate distributorships at the time the 1993 Agreement was offered, if proved, would be insufficient to give rise to the duty to disclose. As with the discussion of the duty identified by Restatement (Second) of Torts § 551(2)(a), discussed above, to establish a duty to disclose in this case, something more is required to establish "objective circumstances,"

§ 551(2)(e), or a "relation of trust and confidence," § 551(2)(a), or, in the broader language of Iowa decisions and the model jury instructions, "special circumstances," giving rise to the duty to disclose.

In this case, Jones has put forward evidence of facts it asserts gives rise to a "relation of trust and confidence" or to WCI's duty to disclose facts basic to the transaction on the basis of "the relationship" between the parties or "objective circumstances." First, Jones points to the longevity of the parties' relationship and Jones's dependence upon WCI for provision of goods as suggesting something of the same sort of confidence and trust as the contractual relationships identified in comments *e* and *f* as pertaining to § 551(2)(a) or demonstrating the objective circumstances required by § 551(2)(e). However, the court doubts that mere longevity of the relationship alone, or even longevity coupled with Jones's dependence upon WCI, would suffice to raise a jury question on whether the necessary "confidential relationship" between two business entities could be established by the applicable "clear and convincing" standard under Iowa law. *Hoelscher v. Sandage*, 462 N.W.2d 289, 292 (Iowa Ct.App.1990) ("The plaintiffs must show by clear proof that a confidential relationship existed" before a duty of disclosure arises). However, Jones has presented evidence of more than this. Jones has pointed to the contract as demonstrating the parties' joint responsibility for advertising and other distribution costs, and, perhaps more importantly, to documentary evidence that WCI had evaluated the effect of terminating its distributorship on Jones and had concluded that Jones would go out of business. This sort of relationship between the parties coupled with WCI's knowledge of the impact upon Jones of its decision to terminate distributorships, if found as facts by the jury, the court concludes, could give rise to WCI's duty to disclose information concerning its plans to terminate distributorships.

■ Jones has also made assertions of a duty to disclose that are recognized by Restatement (Second) of Torts § 551(2)(c), which concerns subsequently acquired information making prior true statements untrue

or misleading. Jones has put forward evidence that it was assured in 1991 that it would always be able to sell WCI brands and that WCI would always need rural distributors. Jones has also put forward evidence suggesting that by the time the 1993 Agreement was offered, WCI planned to terminate distributorships entirely, even if it had not planned to when it made the 1991 assurances. Comment *h* to Restatement (Second) of Torts § 551, concerning § 551(2)(c), states as follows:

> One who, having made a representation which when made was true or believed to be so, remains silent after he has learned that it is untrue and that the person to whom it is made is relying upon it in a transaction with him, is morally and legally in the same position as if he knew that his statement was false when made.

Thus, if a jury finds that WCI did have plans to terminate distributorships at the time the 1993 Agreement was offered, and that such plans were contrary to prior assurances given to Jones, the subsequently acquired information making prior statements untrue or misleading would give rise to a duty on WCI's part to disclose to Jones that it intended to terminate all distributorships, if Jones can demonstrate that WCI knew Jones was relying on those assurances in entering into the 1993 Agreement. Restatement (Second) of Torts § 551(2)(c). Furthermore, Jones has generated a genuine issue of material fact that these circumstances in fact existed by identifying parts of the record supporting its assertions.

■ The situation in which WCI's 1991 assurances were known by WCI to be untrue at the time, but WCI did not believe that Jones would rely on them, may also give rise to a duty to disclose in this case under Restatement (Second) of Torts § 551(2)(d). Jones has put forward evidence that the 1991 assurances were in fact contrary to WCI's plans at the time they were made, and therefore were untrue when made. Comment *i* to Restatement (Second) of Torts § 551(2)(d) states as follows:

> One who knowingly makes a misrepresentation without any expectation that the recipient will act upon it may subsequently discover that the other is relying upon it in a transaction then pending between them. If, in this case, he does not exercise reasonable care to inform the other that his misrepresentation is untrue, he is under the same liability as though he had then made it for the purpose of influencing the other's conduct in the transaction in hand.

Thus, Jones can again establish WCI's duty to disclose if a jury finds that WCI made assurances in 1991 knowing them to be false, and learned that Jones was relying on those assurances in entering into the 1993 Agreement. Restatement (Second) of Torts § 551(2)(d). Again, Jones has generated a genuine issue of material fact that these circumstances in fact existed by identifying parts of the record supporting its assertions.

To summarize, the court concludes that Jones can establish a duty on WCI's part to disclose its plans to terminate distributors at the time it proffered the 1993 Agreement if a jury finds that any of the following sets of circumstances existed. First, the court concludes that the necessary duty arises if a jury finds by clear and convincing evidence these special circumstances: that the parties had a long-term relationship; that Jones was dependent upon WCI for a supply of goods; that the parties had some joint responsibility for advertising and other distribution costs; and that WCI had evaluated the effect of terminating its distributorship on Jones and had concluded that Jones would go out of business. Second, and independently of the first set of special circumstances, Jones may also demonstrate that WCI had the necessary duty to disclose if the jury finds by clear and convincing evidence that WCI had plans to terminate distributorships at the time the 1993 Agreement was offered, and that such plans were contrary to prior assurances given to Jones in 1991, even if WCI believed those assurances to be true at the time they were made, if Jones can also demonstrate that WCI knew Jones was relying on those assurances in entering into the 1993 Agreement. Finally, and again independently, Jones may demonstrate that WCI had the necessary duty to disclose plans to terminate distributors if WCI made assurances in 1991 knowing them to be false at the time, and

learned that Jones was relying on those assurances in entering into the 1993 Agreement. Jones has generated genuine issues of material fact that the requisite special circumstances existed, such that WCI is not entitled to summary judgment on Jones's non-disclosure claim on the ground that Jones cannot show it had a duty to disclose its plans to terminate distributors.

The cases cited by WCI for the proposition that it had no duty to disclose its plan to terminate distributorships are not to the contrary. In *OKI Distrib.*, the district court did indeed hold that the plaintiff had failed to persuade the court that a defendant manufacturer had a duty to disclose to its distributors its plans to make a "structural change" in the way the company operated. *OKI Distrib.*, 850 F.Supp. at 646. However, the court finds no analysis in that decision of whether "special circumstances," the gravamen of Iowa law on the duty of disclosure, could give rise to such a duty, and certainly no consideration of circumstances similar to those alleged by Jones here. *Cloverdale Equip. Co.* is also distinguishable in this regard, because again there is no analysis of whether the plaintiff had shown, or had generated a genuine issue of material fact as to whether there existed, "special circumstances" creating a duty of disclosure. *Cloverdale Equip. Co.*, 869 F.2d 934.[21]

Turning to the allegations of non-disclosure based on WCI's failure to disclose material changes to the contract in the cover letter accompanying the 1993 Agreement, Jones alleges that WCI's duty to disclose arose from its partial or ambiguous statement that it was seeking a new contract to "update its files" and its statement that Jones should review the typed information. Jones asserts that a genuine issue of material fact is raised as to the ambiguity or completeness of the disclosures in the cover let-

ter, because of the significant change to the termination provisions which is not part of the "typed" information. Similarly, Jones contends that a genuine issue of material fact is raised as to completeness or ambiguity of the disclosures in the cover letter, because WCI was not just "updating" its files, but seeking to change contract terms. This genuine issue of material fact is generated from evidence Jones has submitted indicating that WCI recognized that it had to alter the termination provisions of Jones's contract in order to terminate Jones's distributorship.

The court agrees that these circumstances, statements in the cover letter that are partial or ambiguous in light of all the circumstances known to WCI, if found by a jury, would suffice to give rise to a duty to disclose changes in the 1993 Agreement pursuant to Restatement (Second) of Torts § 551(2)(b). Comment *g* clarifies this duty to disclose when partial or ambiguous information has been given:

> A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not. (See § 529). So also may a statement made so ambiguously that it may have two interpretations, one of which is false. (See §§ 527, 528). When such a statement has been made, there is a duty to disclose the additional information necessary to prevent it from misleading the recipient. In this case there may be recovery either on the basis of the original misleading statement or of the nondisclosure of the additional facts.

Thus, if a jury finds by clear and convincing evidence that WCI knew either the statement that Jones should check the typed material or the statement that the 1993 Agreement was intended to update WCI's files in the cover letter was partial or ambiguous in

---

21. WCI wisely does not cite the case upon which *OKI Distrib.* relied for the proposition that a manufacturer does not have a duty to insulate distributors from all economic hardship at its own expense, *General Aviation, Inc. v. Cessna Aircraft Co.*, 13 F.3d 178, 183 (6th Cir.1993). In the *General Aviation* case, the Sixth Circuit Court of Appeals considered a claim of discriminatory termination of a dealership, and concluded that, although a manufacturer had no duty to insulate

distributors from all economic hardships, it still had means to deal effectively with its own economic hardship, such as changing the terms of all of its franchise agreements or terminating those that are distinguishable, without "unfairly discriminat[ing] between similarly situated franchises when offering renewal contracts." *General Aviation*, 13 F.3d at 183. Thus, *General Aviation* is entirely distinguishable.

light of the circumstances, then WCI had a duty to disclose the change to the termination provision and its purpose in proffering a new contract.

### d. Other elements of the claim

The court does not ignore WCI's assertions that Jones cannot generate a genuine issue of material fact as to certain other elements of its claim of fraudulent non-disclosure.[22] WCI asserts that a modification to provide for "without-cause" termination in the 1993 Agreement was not a "material" matter it would have to disclose, even if it had a general duty to disclose material matters, because the 1993 Agreement only "streamlined" the termination process provided in the 1987 Agreement. However, the court finds that Jones has generated at least a genuine issue of material fact that a "without cause" termination clause was indeed a material change, when the prior agreement provided only for termination by WCI for cause or upon mutual consent. Because WCI does not even address the materiality of the non-disclosure of its intention to terminate distributorships, the court concludes that WCI concedes there is at least a genuine issue of material fact as to the materiality of that information. WCI relies on the rejection in *OKI Distrib.* of "post-contract evidence stemming from the 'pep talks' wherein the Defendants stated their devotion to the 'two step' process" as not constituting promises upon which the plaintiff could reasonably rely. *OKI Distrib.*, 850 F.Supp. at 646. However, in this case, Jones is not relying on "post-contract" assurances, but pre-contract evidence of assurances of a continuing relationship, as to one kind of non-disclosure, and pre-contract non-disclosure of the "without cause" termination clause, on the other. Furthermore, the court in *OKI Distrib.* found only "conclusory allegations" of intentional inducement and failure to point to any record evidence indicating intentional misleading of the plaintiff or the plaintiff's reasonable reliance. *Id.* In contrast, Jones has generated a genuine issue of material fact as

to intentional inducement from record evidence that WCI knew contracts had to be changed to effect the termination of distributorships at will and evidence that WCI employees were cautioned to maintain a "business-as-usual" atmosphere while preparing for the terminations. Jones has also generated a genuine issue of material fact as to whether it relied upon either the assurances or the cover letter and whether that reliance was reasonable, in light of the parties' long-term relationship, the proffer of the assurances allegedly in response to Jones's concerns about possible future termination, and, as to the cover letter non-disclosures, the difference between the lack of citation of changes in the 1993 cover letter, as compared to the specific notation of changes in the cover letter accompanying the 1987 Agreement. The court therefore concludes that WCI is not entitled to summary judgment on either of Jones's fraudulent non-disclosure claims.

Thus, this matter will proceed to trial on the two fraud claims in Jones's complaint. The final matter the court must address is whether this matter must also proceed to trial on WCI's counterclaim.

### E. WCI's Counterclaim

In its counterclaim, WCI seeks judgment in the amount of $457,910.95 due under a statement of account in connection with the distributorship agreement. Jones does not dispute that this sum is due and owing. However, Jones contends that its damages will exceed any amount due WCI, and therefore the court should not enter judgment until after trial of Jones's own claims. At oral arguments, WCI asserted that pursuant to *Fed.R.Civ.P.* 56(d), the court should determine the amount of its damages on its counterclaim, so that that issue need never be presented to the jury, but stay entry of the judgment until the entire proceedings are concluded. Counsel for Jones concurred in such a disposition of the counterclaim.

---

**22.** In its challenge to the non-disclosure claim, WCI reasserts its contention, which the court disposed above, that representations about the future cannot form the basis for a fraud claim. However, how such an argument can relate to the *non-disclosure* of information eludes the court.

Federal Rule of Civil Procedure 56(d) provides as follows:

> If on motion under this rule judgment is not rendered upon the whole case or for all the relief asked and a trial is necessary, the court at the hearing of the motion, by examining the pleadings and the evidence before it and by interrogating counsel, shall if practicable ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy, including the extent to which the amount of damages or other relief is not in controversy, and directing such further proceedings in the action as are just. Upon the trial of the action the facts so specified shall be deemed established, and the trial shall be conducted accordingly.

Fed.R.Civ.P. 56(d). The court deems WCI's counterclaim to fit precisely within the procedures established by this rule.

The record establishes beyond dispute that WCI is due and owed $457,910.95 under a statement of account in connection with the distributorship agreement. WCI is therefore entitled to judgment in that amount. This matter need not be of further concern in the trial of Jones's remaining claims, and trial shall be conducted accordingly. However, entry of judgment on WCI's counterclaim shall be stayed until disposition of Jones's claims at trial.

## V. Conclusion

The court's course to its disposition of the motions for summary judgment on both Jones's and WCI's claims has been long and at time circuitous. Therefore, a reiteration of the court's conclusions as to the disposition of each of the claims in this lawsuit is in order. First, the disposition of certain claims was not disputed. Consequently, summary judgment in WCI's favor is **granted** on Jones's fifth cause of action—which alleges "unjust enrichment"—and Jones's seventh cause of action—which alleges violation of the anti-trust laws of the states of South Dakota, Nebraska, and Iowa. These claims are dismissed from the action. Furthermore, the court finds that Jones has failed to meet its burden in resisting summary judgment as to its third cause of action alleging violation of the franchise statutes of South Dakota, Nebraska, and Iowa. Jones has failed to designate any portions of the record giving rise to a genuine issue of material fact on any of these claims. Therefore, summary judgment is **granted** in favor of WCI on this cause of action as well, and it is dismissed from the action.

The analysis of Jones's contract claims has been somewhat more complicated. However, the court finds that the mutual "without cause" or "at-will" termination clause is not substantively unconscionable on its face. Indeed, courts have uniformly rejected claims of unconscionability of at-will termination clauses in distributorship agreements. Even assuming the circumstances alleged by Jones to be true, the fact that the "without cause" termination clause might have adversely affected Jones more than WCI does not establish that the clause unreasonably favored WCI. Because the court finds no showing can be made as to the substantive unconscionability of the contract clause providing that either party could terminate the distributorship agreement without cause upon sixty days notice, and some showing on this prong is required, the court did not consider whether Jones could make an adequate showing of procedural unconscionability. Nonetheless, summary judgment in WCI's favor is **granted** on that portion of Jones's first cause of action asserting unconscionability.

Summary judgment in WCI's favor is also **granted** as to those portions of Jones's first cause of action alleging breach of contract. Jones has failed to generate a genuine issue of material fact as to the existence of a contract, the first element of its breach of contract claims, as to any claim depending on the continuing existence of the 1987 Agreement. The 1987 Agreement was superseded by the 1993 Agreement. Jones has also failed to generate a genuine issue of material fact as to the existence of an "exclusivity" agreement by a course of dealing, because all of the contracts and the undisputed facts concerning the course of dealing of the parties demonstrate that Jones had only a non-

exclusive agreement. The breach of contract claims are therefore dismissed from this action.

As to the claim of breach of covenant of good faith and fair dealing, the court concludes that the alleged violations of good faith were actually exercises of rights specifically reserved under the 1993 Agreement and therefore cannot form the basis of a claim of breach of duty of good faith. Other elements of Jones's claim of breach of good faith, the court finds, are properly cognizable, if at all, under Jones's claims of fraudulent misrepresentation or fraudulent non-disclosure. Thus, summary judgment in WCI's favor is **granted** on Jones's sixth cause of action alleging breach of the covenant of good faith and fair dealing, and that claim is also dismissed from this action.

Turning to Jones's tort claims, the court finds that Jones's claim of tortious interference with business relationships must fail. Jones is unable to generate a genuine issue of material fact that WCI's "interference" with Jones's customers was "improper," one of the essential elements of such a claim. Instead, it is undisputed that the 1993 Agreement and the prior agreements all provided that WCI could make contacts with Jones's customers even had the contracts between Jones and WCI still been in force. Furthermore, the course of dealing of the parties demonstrates beyond dispute that WCI had made such contacts with customers in Jones's "Area of Primary Responsibility" pursuant to the reserved right in the contract. Summary judgment is therefore **granted** in WCI's favor on Jones's second cause of action asserting a claim of tortious interference with business relationships, and that tort claim is dismissed from this action.

Summary judgment will not be granted, however, on either Jones's claim of fraudulent misrepresentation or its claim of fraudulent non-disclosure. As to the first of these claims, although it is with reservations, the court concludes that Jones has generated genuine issues of material fact as to each element of the claim WCI challenged. As to the fraudulent non-disclosure claim, contrary to WCI's assertions, the court concludes that Jones has generated genuine issues of mate-rial fact as to "special circumstances" that, if found by a jury, the court holds suffice as a matter of law to. establish WCI's duty to disclose the information in question. In reaching this conclusion, the court was guided principally by the Restatement (Second) of Torts, upon which Iowa courts often rely for identification of the duties of parties. Furthermore, the court finds that Jones has generated genuine issues of material fact as to the other challenged elements of its fraudulent non-disclosure claim. Therefore, summary judgment in WCI's favor is **denied** as to Jones's fourth cause of action—alleging fraudulent misrepresentation—and Jones's ninth cause of action—alleging fraudulent non-disclosure. This matter will therefore proceed to trial on these two fraud claims.

Finally, the court concludes that summary judgment in WCI's favor on its counterclaim is **granted.** The parties do not dispute the amount due WCI from Jones under a statement of account in connection with the distributorship agreement is $457,910.95. The issues pertaining to the counterclaim will be of no further concern in the trial of this matter. Judgment on the counterclaim in the amount of $457,910.95 will be entered in WCI's favor at the conclusion of trial in this matter, subject to offsetting damages, if any, awarded to Jones for WCI's wrongful conduct. However, entry of judgment on the counterclaim is **stayed** pending disposition of Jones's remaining claims at trial.

**IT IS SO ORDERED.**